# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 2, 2013 Session

## STATE OF TENNESSEE v. FRED CHAD CLARK, II

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2007-C-2067        Mark J. Fishburn, Judge**

_____

**No. M2010-00570-SC-R11-CD - Filed November 10, 2014**

_____

This case involves the prosecution of a father in the Criminal Court for Davidson County for the sexual abuse of his children. After a jury found him guilty of seven counts of rape of a child and two counts of aggravated sexual battery, the trial court imposed an effective thirty-four-year sentence. On appeal, the defendant took issue with (1) the admissibility of recordings of his confession to his wife, (2) the adequacy of the corroboration of his confession, (3) the admissibility of evidence of his predilection for adult pornography, and (4) the propriety of a jury instruction that the mental state of "recklessness" could support a conviction for both rape of a child and aggravated sexual battery. After upholding the admission of the defendant's confession to his wife and the jury instructions, the Court of Criminal Appeals decided that the admission of the evidence of the defendant's predilection for adult pornography, while erroneous, was harmless. The Court of Criminal Appeals also determined that the record contained sufficient evidence to uphold three counts of rape of a child and the two counts of aggravated sexual battery. *State v. Clark*, No. M2010-00570-CCA-R3-CD, 2012 WL 3861242 (Tenn. Crim. App. Sept. 6, 2012). We granted the defendant's Tenn. R. App. P. 11 application for permission to appeal and now affirm the judgment of the Court of Criminal Appeals.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Fred Chad Clark, II.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Brent C. Cherry, Assistant Attorney General; John H. Bledsoe, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.**

Chad Clark, his wife, and their two daughters, H.C. (age 6) and K.C. (age 4), were at home on the evening of January 12, 2007.[1] Mr. Clark's mother was visiting. While his wife was watching television, Mr. Clark, his mother, and his two daughters were using the computer to look at pictures and videos of a recent family trip to Disney World.

In an effort to get attention, H.C. grabbed her father's hand and moved it between her legs. When Mr. Clark pulled his hand away, H.C. announced that she had put her daddy's hand on her "coo-coo."[2] Ms. Clark took H.C. upstairs and told her that her conduct was inappropriate. The rest of the evening continued without incident, but the Clarks' family life was about to change dramatically.

While bathing K.C. the following Sunday evening, Ms. Clark told her that she should never permit anyone to touch her private parts, and she asked K.C. whether anyone had ever touched her inappropriately. According to Ms. Clark, K.C. replied that her father had touched her. To demonstrate what her father had done, K.C. put her own hand near her groin and started moving it around. K.C. then told her mother that sometimes her father "goes like this, and sometimes he goes crazy." She also told her mother that this happened at night when Ms. Clark was in bed.

Disturbed by this information, Ms. Clark gathered up H.C. and K.C. and left the house. She told Mr. Clark they were going shopping, but instead, Ms. Clark drove to the home of the school guidance counselor. After K.C. told the counselor that her father had touched her private parts and had instructed her not to tell her mother about it, Ms. Clark telephoned the Tennessee Department of Children's Services and the Metropolitan Nashville Police Department.

---

[1]To protect the identity of the victims in this case, we are identifying them by their initials.

[2]This is a term the children used for their private parts.

-2-

Ms. Clark and the children spent the next few nights in a hotel. She spoke with Mr. Clark several times by telephone. Ms. Clark did not divulge K.C.'s accusations during these conversations. Instead, she told Mr. Clark that she needed some time away to deal with the stress surrounding their plans to move into a new house.

Ms. Clark met with Detective David Zoccola on January 18, 2007, at the Criminal Justice Center in Nashville. She agreed to cooperate with the investigation of her daughters' statements by making a "controlled" police-recorded telephone call to Mr. Clark using a special police department telephone. During Ms. Clark's forty-five minute conversation with Mr. Clark, Detective Zoccola wrote notes to Ms. Clark suggesting things she could say to elicit a confession from Mr. Clark.

At the outset of the conversation, Mr. Clark denied touching his daughters inappropriately and suggested that the family should seek counseling. Ms. Clark implored him to tell the truth and told him that if he did, the family could be reunited and return to normal. When Mr. Clark offered to "lie" and spin a contrived story about molesting the girls so that they could come home, Ms. Clark responded that she absolutely needed to hear "the truth." She told Mr. Clark:

> Just say you did it so I know you did it and then we can get on with our lives. Just be honest with me, Chad. I don't want to deal with this anymore. I want to move on. I want to start today being a family again. I want to come home tonight. I want to bring our girls. I want us to lay down in their bed and say their prayers like we do every night and be a family again.

Mr. Clark replied that he had "touched" his daughters but that he could not remember the details. Toward the end of the conversation, Mr. Clark became suspicious that the call was being monitored because he heard static on the line. He told Ms. Clark that he would call her back soon to make arrangements for the two of them to have a conversation face-to-face.

Mr. Clark called Ms. Clark on her cellular telephone before the police could install a recording device on it. The police recorded Ms. Clark's side of the conversation. During this call, Ms. Clark made arrangements with Mr. Clark to meet him that evening in the parking lot of the Opry Mills shopping center in Nashville.

The police installed a recording device and a transmitter in Ms. Clark's automobile. At the authorities' request, Ms. Clark signed a form consenting to having her conversation with her husband monitored and recorded by the police. This form also stated, "I understand

that any recording made will become evidence in a criminal case being investigated by Det. David Zoccola."

Mr. Clark was already waiting in his automobile when Ms. Clark arrived at the shopping center. Approximately eight police officers were nearby in unmarked vehicles ready to listen in on the Clarks' conversation. Mr. Clark got into his wife's automobile and immediately began divulging the details of occasions when he had touched his daughters inappropriately.

During this recorded conversation, Mr. Clark recalled the times when Ms. Clark had caught him looking at pornography at night on the Internet. Suggesting that the pornography was related to his conduct with his daughters, Mr. Clark explained that looking at pornography gave him "these thoughts . . . just, you know, thinking about sex" and that these thoughts prompted him to start looking at his daughters' private parts when they were in the bathtub and then to touch their genitals and to stick his finger in their anuses. Mr. Clark eventually told Ms. Clark that he had touched H.C. inappropriately five to seven times and K.C. two to four times. He also admitted that he had instructed the children to keep his conduct a secret.

Ms. Clark received one telephone call from the police during the conversation to tell her that she should end the discussion because they had obtained sufficient evidence against Mr. Clark. The police arrested Mr. Clark when he got out of his wife's automobile. During a subsequent two-hour interrogation, Mr. Clark retracted the incriminating statements he had made to his wife and made no further incriminating statements. On August 7, 2007, a Davidson County grand jury indicted Mr. Clark for twelve counts of rape of a child in violation of Tenn. Code Ann. § 39-13-522(a) (Supp. 2007) and two counts of aggravated sexual battery in violation of Tenn. Code Ann. § 39-13-504 (2006).

On June 6, 2008, Mr. Clark moved to suppress the conversations with his wife that had been recorded by Detective Zoccola and his team. He argued that his wife was acting as an agent of the police when he confessed and that she had coerced him into making involuntary confessions that were false. The trial court conducted a suppression hearing on July 17, 2008, at which Detective Zoccola testified.

The trial court denied Mr. Clark's motion to suppress on October 1, 2008. After noting the State's argument that Ms. Clark had been motivated to cooperate with the authorities "solely by her concern for the health, safety, and welfare of her daughters," the court found that Ms. Clark "was equally, if not primarily, motivated by her desire to gather evidence for criminal prosecution." Because the authorities had instigated and guided the recorded conversations, the court decided that Ms. Clark had been "an instrument of the

State." However, the trial court decided that Mr. Clark's recorded statements to his wife were admissible because they had not been coerced. The trial court also granted Mr. Clark permission to seek an interlocutory appeal of its decision, but the appellate courts declined to hear the appeal.

On August 31, 2009, Mr. Clark filed a motion to exclude the evidence related to his possession of adult pornography. The trial court granted the motion and ordered that the recordings of Mr. Clark's conversations with his wife be redacted to eliminate the references to his possession and enjoyment of pornography. The case proceeded to trial in September 2009, but the jury was unable to agree upon a verdict.

Prior to his second trial, Mr. Clark sought permission to call Dr. James Walker, a forensic neuropsychologist at Vanderbilt University. Dr. Walker planned to testify that Mr. Clark had an unusually high degree of "interrogative suggestibility" which made him predisposed to making false confessions when under pressure. During a hearing on November 12, 2009, Dr. Walker told the court that he had concluded that Ms. Clark dominated the marital relationship and that Mr. Clark was atypically weak-willed and compliant, especially toward Ms. Clark. Following the hearing, the trial court decided that Dr. Walker could testify. However, the court also decided that the State would be permitted to introduce evidence that Mr. Clark used pornography (knowing that his wife disapproved) in order to demonstrate that Mr. Clark did not always yield to his wife's wishes.

Mr. Clark's second trial commenced on November 16, 2009. At the outset, Mr. Clark's two daughters testified that their "dad" had touched their "private parts" but that they did not remember much about these incidents any more. In addition to the children, the State called Ms. Clark, the school guidance counselor who had first talked with the children, the teacher of the children's Bible class, the nurse practitioner who interviewed and examined the children at the Our Kids Center, Detective Chad Gish who installed the recording device in Ms. Clark's automobile and who analyzed the contents of Mr. Clark's computer, and Detective Zoccola. During Detective Zoccola's testimony, the jury heard the recordings of the three conversations between Mr. Clark and his wife – the original controlled call, the one-sided telephone call, and the conversation in Ms. Clark's automobile.

Mr. Clark testified on his own behalf and insisted that he had falsely confessed to crimes that he had not committed. He also presented the testimony of his mother, a co-worker and neighbor, and Dr. Walker. Dr. Walker described Mr. Clark as an unassertive and weak-willed man who was henpecked by his wife. He also testified that Mr. Clark's score

on the Gudjonsson Suggestibility Scale[3] was unusually high, which indicated that Mr. Clark was highly susceptible to being coerced into falsely confessing.

On November 19, 2009, the jury found Mr. Clark guilty of two counts of aggravated sexual battery and seven counts of rape of a child. On January 7, 2010, the trial court sentenced Mr. Clark to an effective sentence of thirty-four years. Mr. Clark appealed, and the Court of Criminal Appeals affirmed three of his rape convictions and his two convictions for aggravated sexual battery but reversed four of Mr. Clark's rape convictions because of problems in the State's election of offenses. The intermediate appellate court also affirmed Mr. Clark's thirty-four-year sentence. *See State v. Clark*, No. M2010-00570-CCA-R3-CD, 2012 WL 3861242 (Tenn. Crim. App. Sept. 6, 2012).

We granted Mr. Clark's Tenn. R. App. P. 11 application for permission to appeal.[4] Later, we docketed this case with *State v. Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012), *perm. app. granted* (Tenn. Feb. 15, 2013), another case that involved the police surreptitiously recording the defendant's incriminating statements to the victim's mother.

Mr. Clark raises four errors in this appeal. First, he asserts that the evidence is insufficient to support any of his convictions because the State failed to present independent evidence corroborating his confession. Second, he argues that the trial court erred by failing to suppress the recordings of his conversations with his wife. Third, he insists that the trial court erred by permitting the State to present evidence relating to his possession and enjoyment of pornography. Finally, Mr. Clark asserts that the trial court erred by instructing the jury that the mental state of "recklessness" could support convictions for rape of a child and aggravated sexual battery.

## II.

Mr. Clark's first challenge is to the sufficiency of the evidence. Our role with regard to this issue in a criminal case is to "determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Hawkins*, 406 S.W.3d 121, 130 (Tenn. 2013) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979));

---

[3] *See* Gisli H. Gudjonsson, *Suggestibility and Compliance Among Alleged False Confessors and Resisters in Criminal Trial*, 31 Med. Sci. & L. 147 (1991); Gisli H. Gudjonsson, *A New Scale of Interrogative Suggestibility*, 5 Personality & Individual Differences 303 (1984).

[4] The State has not taken issue with the reversal by the Court of Criminal Appeals of four of Mr. Clark's seven rape convictions.

*see also* Tenn. R. App. P. 13(e). In conducting this analysis, "we must afford the State the strongest legitimate view of the evidence and any reasonable inferences that may be drawn from it." *State v. James,* 315 S.W.3d 440, 455 (Tenn. 2010). A verdict of guilty replaces the defendant's presumption of innocence with a presumption of guilt. The defendant thus bears the burden of demonstrating insufficiency of the evidence. *State v. Sisk,* 343 S.W.3d 60, 65 (Tenn. 2011).

We apply the same standard of review to both circumstantial and direct evidence. Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. *State v. Hawkins*, 406 S.W.3d at 131; *State v. Dorantes,* 331 S.W.3d 370, 379-81 (Tenn. 2011).

Specifically, Mr. Clark relies on the long-established common-law rule that a conviction cannot be founded solely on a defendant's confession. A conviction based on a confession cannot stand unless the jury was presented with independent corroborating evidence. *See State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000).

In *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), we recently clarified the corroboration rule in Tennessee. Tennessee follows the "modified trustworthiness standard" rather than the traditional *corpus delicti* rule. *State v. Bishop*, 431 S.W.3d at 59-60. We explained that under this standard:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*State v. Bishop*, 431 S.W.3d at 60.[5] "Prima facie" evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." *Black's Law Dictionary* 638-39 (9th ed. 2009). "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." *Black's Law Dictionary* 640 (9th ed. 2009).

The corroboration requirement is a low threshold. Its purpose is twofold: to weed out false confessions to nonexistent crimes (by requiring some independent evidence that the injury occurred) and to weed out false confessions to actual crimes (by requiring some independent evidence that implicates the accused). *State v. Bishop*, 431 S.W.3d at 59-60. The standard of proof required to clear this hurdle is even lower than the "preponderance of the evidence" standard. *State v. Bishop*, 431 S.W.3d at 60 n.33 (quoting *Smith v. United States*, 348 U.S. at 156).

Examples of crimes that result in no tangible injury to an identifiable victim include inchoate crimes, certain financial crimes, status crimes, and child molestations that involve no physical evidence and about which the victim is too young to testify or is unable to remember the crime. *State v. Bishop*, 431 S.W.3d at 59 n.27. In this case, Mr. Clark was accused of committing physical acts against identifiable victims. While the victims were young and their memories of the events were minimal, the victims were capable of testifying. Thus, this is a "tangible injury" case. To meet the corroboration requirement, the State was required to present the jury with substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred.

Aside from Mr. Clark's recorded admissions, the only substantive evidence the State offered at trial was the testimony of his two young daughters. Other witnesses, including Ms. Clark and the guidance counselor, recounted the girls' earlier statements to them that contained details of the crimes. But these prior out-of-court statements were offered as "prior consistent statements" in response to Mr. Clark's attempts to impeach the girls' credibility. The trial court instructed the jury that these statements were not offered for the proof of their content. *See* Tenn. R. Evid. 801.

---

[5]*See also Smith v. United States*, 348 U.S. 147, 152-59 (1954); *Opper v. United States*, 348 U.S. 84, 90-94 (1954); *State v. Reddish*, 859 A.2d 1173, 1211-13 (N.J. 2004); *State v. Hardy*, 2012-NMCA-005, ¶ 10, 268 P.3d 1278, 1282 (N.M. Ct. App. 2011), *cert. granted*, 291 P.3d 599 (N.M. 2012), *and cert. quashed*, 299 P.3d 423 (N.M. 2012); *State v. Weisser*, 2007-NMCA-015, ¶¶ 17-25, 150 P.3d 1043, 1048-50 (N.M. Ct. App 2006).

-8-

The girls' trial testimony was brief and conveyed few details. When asked, "Why are you here today?," K.C. replied, "Because my dad did something bad." K.C. said her dad "touched a private part," and did it on "the skin" rather than over her clothes. She acknowledged the events were hard to remember because they happened so long ago. In response to the prosecutor's question, she said she had told the truth when she told her mother what happened. K.C. said she remembered her dad touching her in the bathroom at her house while H.C. was present, but otherwise she "sort of forgot a bunch of it."

H.C. also testified. When the prosecutor asked her, "what happened," H.C. responded, "we had a problem and my dad touched me in my private area." The prosecutor asked whether it happened at her house. H.C. responded, "That I do not know." Like K.C., H.C. acknowledged that she had told the truth when she told her mom about the touching. Both children identified the "private" area using a drawing of a naked girl.

The children's testimony alone provided adequate corroborating evidence to clear the low threshold of the modified trustworthiness standard. First, their testimony provided prima facie evidence that a sex crime had occurred. Second, their testimony provided substantial independent evidence that Mr. Clark's confession was trustworthy. In *State v. Bishop*, we explained that "[t]o establish trustworthiness, the State's independent evidence must *corroborate essential facts* contained in the defendant's statement. For example, independent corroboration of one key part of an extrajudicial confession or admission may corroborate the entire statement." *State v. Bishop*, 431 S.W.3d at 59 (emphasis added). There is no need to corroborate every element of the crime or every crime contained in the confession. *State v. Bishop*, 431 S.W.3d at 60 n.33.

During his conversations with his wife, Mr. Clark confessed to as many as eleven acts of sexual molestation against his daughters. The children's sworn testimony – that their "dad" did something "bad" by touching their "private" parts – corroborated the key aspect of Mr. Clark's confession, namely that he put his finger on and inside the girls' vaginas and anuses. In addition to corroborating these "essential facts," the children were also able to identify their father as the person who touched them, and K.C. recalled an inappropriate touching that occurred in the family's bathroom.

These details agree with Mr. Clark's admission that he was the perpetrator and his identification of the bathroom as the location of some of the sexual activity. In other words, the girls' testimony included "facts that establish the crime which corroborate facts contained in the confession." This is one type of evidence that satisfies the modified trustworthiness standard. *State v. Bishop*, 431 S.W.3d at 60 n.32 (quoting *People v. LaRosa*, 2013 CO 2, ¶ 41, 293 P.3d 567, 578 (Colo. 2013), *reh'g denied* (Feb. 11, 2013)). Once the State presented evidence indicating that a key aspect of Mr. Clark's confession was trustworthy, the jury was

free to convict him of any criminal act contained in his confession. *See United States v. Brown*, 617 F.3d 857, 863 (6th Cir. 2010) (explaining that independent corroboration of one part of a defendant's incriminating statement may corroborate the statement as a whole); *State v. Bishop*, 431 S.W.3d at 59 (explaining that "independent corroboration of one key part of an extrajudicial confession or admission may corroborate the entire statement").

We hold that his daughters' testimony adequately corroborated Mr. Clark's incriminating statements to his wife. Based on his admissions, a rational trier of fact could have found Mr. Clark guilty beyond a reasonable doubt of the five convictions that were upheld by the Court of Criminal Appeals. Mr. Clark has not met his burden of establishing the insufficiency of the evidence. We therefore will not reverse these five convictions for lack of corroboration or insufficient evidence.

**III.**

Mr. Clark also asserts that the trial court erred by failing to suppress the recordings of his conversations with his wife. He claims that admitting the surreptitiously-recorded conversations into evidence violated his right against compulsory self-incrimination[6] and his right to due process of law[7] because Ms. Clark was acting as a state agent when she confronted him and because Ms. Clark dragooned him into confessing against his will by using threats, promises, and emotional appeals.

In Tennessee, the voluntariness of a confession is a question of fact, and the State has the burden of proving the voluntariness of a confession by the preponderance of the evidence. *State v. Sanders*, ___ S.W.3d ___, ___, 2014 WL ___, at ___ (Tenn. 2014). When the trial court makes findings of fact at the conclusion of a suppression hearing, those findings are generally binding upon this Court unless the evidence in the record preponderates against them. The trial court is entrusted with determining the credibility of the witnesses, weighing the evidence, and resolving conflicts in the evidence, and it is not this Court's job to second-guess these determinations. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). If, on the other hand, the trial court bases its findings solely on evidence for which witness credibility is not an issue, appellate courts may review that evidence de novo without a presumption of correctness. *State v. Northern*, 262 S.W.3d 741, 748 n.3 (Tenn. 2008); *State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004). In this case, the suppression hearing included testimony from Detective Zoccola regarding the circumstances surrounding the recorded conversations. Therefore, de novo review of the facts is not appropriate.

---

[6] *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9.

[7] *See* U.S. Const. amend. XIV; Tenn. Const. art. I, § 8.

-10-

When reviewing a suppression motion, appellate courts should consider the entire record, including the evidence adduced at trial. We have also long held that the party who prevails at the suppression hearing is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Bishop*, 431 S.W.3d at 35 (quoting *State v. Echols*, 382 S.W.3d at 277). Finally, even if a trial court commits non-structural constitutional error by failing to suppress an involuntary statement, we may affirm the conviction if the State proves beyond a reasonable doubt that the error did not affect the verdict. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).

## A.

We considered Mr. Clark's case along with that of Henry Floyd Sanders. In *State v. Sanders*, we held that the self-incrimination protections of the Fifth Amendment and Tenn. Const. art. I, § 9 are not triggered when a private citizen who is cooperating with the police elicits a confession from a suspect during the early stages of a criminal investigation. *State v. Sanders*, ___ S.W.3d at ___. The exclusionary rule is a prophylactic measure designed to deter future police misconduct. When a private citizen obtains admissions from a suspect while cooperating with the police, there is no police misconduct to be deterred. *State v. Sanders*, ___ S.W.3d at ___ (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 488 (1971)). While noting that we had previously adopted a two-factor test for determining when a private person qualifies as a state agent for purposes of the constitutional right against unreasonable searches and seizures in *State v. Burroughs*, 926 S.W.2d 243, 245-46 (Tenn. 1996), we held that this "legitimate independent motivation test" is not appropriate in the Fifth Amendment context. *State v. Sanders*, ___ S.W.3d at ___.

Instead, we determined that when a victim (or victim's relative or friend) goes to the police and then, with police assistance, elicits a confession from a suspect, the suspect has simply misplaced his trust in a confidant. *See United States v. White*, 401 U.S. 745, 749 (1971); *Hoffa v. United States*, 385 U.S. 293, 413 (1966); *Lopez v. United States*, 373 U.S. 427, 443-45 (1963); *State v. Branam*, 855 S.W.2d 563, 568 (Tenn. 1993); *State v. Pate*, No. M2009-02321-CCA-R3-CD, 2011 WL 6935329, at *10 (Tenn. Crim. App. Nov. 22, 2011), *perm. app. denied* (Tenn. Apr. 11, 2012); *Clariday v. State*, 552 S.W.2d 759, 769 (Tenn. Crim. App. 1976). "The United States Constitution provides no protection for those who voluntarily offer information to a confidant." *State v. Sanders*, __ S.W.3d __, __, 2014 WL __, at *__ (quoting *State v. Bacon,* No. 03C01-9608-CR-00308, 1998 WL 6925, at *12 (Tenn. Crim. App. Jan. 8, 1998) (No Tenn. R. App. P. 11 application filed)) In "misplaced trust" cases, courts generally assume the informant is a state agent, and find that voluntary statements made to an informant do not warrant constitutional protection. *State v. Sanders*, ___ S.W.3d at ___. However, we also noted that even in "misplaced trust" cases, an

involuntary confession is inadmissible. To determine whether a confession was given voluntarily, a court must decide whether it was "the product of a rational intellect and a free will." The pivotal question of the voluntariness test is "whether a suspect's will was overborne so as to render the confession a product of coercion." The test examines the totality of the circumstances surrounding the confession, including "the characteristics of the accused and the details of the interrogation." An error in admitting an involuntary confession is nevertheless subject to a harmless error analysis. *State v. Sanders*, __ S.W.3d at __, 2014 WL __, at *__.

**B.**

Here, although the trial court considered Ms. Clark to be a state agent, it held that she did not overbear Mr. Clark's will. In its order denying Mr. Clark's motion to suppress, the trial court distinguished Mr. Clark's case from two others in which the Court of Criminal Appeals found that state agents had induced an involuntary confession, *State v. Womack*, No. E2003-02332-CCA-R3-CD, 2005 WL 17428 (Tenn. Crim. App. Jan. 4, 2005) (No Tenn. R. App. P. 11 application filed), and *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000) (No Tenn. R. App. P. 11 application filed).

The trial court found that Ms. Clark's "false promises" to keep Mr. Clark's admissions secret were distinguishable from similar promises made by authority figures who could realistically promise him leniency in prosecution. The court found that if Mr. Clark believed he could avoid prosecution by confessing, this could be "chalked up more to misplaced trust in his wife than to the realities of the situation." The court noted that even though Ms. Clark misrepresented to her husband that no one was listening, Ms. Clark made no misrepresentations about the evidence.

The court found that Ms. Clark generally made truthful statements about Mr. Clark's predicament and that such statements do not qualify as unduly coercive. The court concluded that "the confession by Mr. Clark was not the result of his will being overborn[e]." The court found it particularly significant that

> Mr. Clark's first affirmative, unqualified admission was given in the [Opry Mills] conversation without any prodding by Mrs. Clark. More importantly, this admission that he had touched both girls occurred after he had time away from Mrs. Clark between the two conversations to pause and reflect on his situation and decide for himself what he was going to do.

The Court of Criminal Appeals upheld the denial of Mr. Clark's suppression motion on essentially the same grounds. *State v. Clark*, 2012 WL 3861242, at \*28-29.

Affording the State the strongest legitimate view of the evidence, we hold that the evidence does not preponderate against the trial court's finding that Mr. Clark's confession was voluntary. Although he initially denied the allegations during the first phone call, forty-five minutes into the conversation Mr. Clark acknowledged that he had "touched" the girls. As the lower courts noted, Mr. Clark was with his mother for several hours between the phone calls and the conversation at Opry Mills. He had time to think and consider what he should do and say when he met his wife. When the two met, Mr. Clark almost immediately began revealing details of the molestations, stating that he had touched the girls inappropriately as many as eleven times over a period of several months. It was Mr. Clark who arranged the meeting. Ms. Clark did not confine him, yell at him, or threaten him with anything other than the normal consequences one might face after sexually assaulting his own children.

Although Dr. Walker opined that Mr. Clark was abnormally susceptible to manipulation, the record reflects that Mr. Clark was a manager at a security alarm company, a homeowner, and an adult with a stable family and an active social life. When two seasoned police officers interrogated him for over two hours, he confessed to nothing. Having examined the totality of the circumstances, particularly the characteristics of the defendant and the circumstances of the interrogation, we decline to find that Mr. Clark's confession was not the product of a rational intellect and a free will.

Consistent with our holding in *State v. Sanders*, we find that Ms. Clark's interrogation of Mr. Clark did not implicate Mr. Clark's right against compulsory self-incrimination. The constitutional right against compulsory self-incrimination "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" *United States v. White*, 401 U.S. at 749 (quoting *Hoffa v. United States*, 385 U.S. at 302). We also conclude that the evidence does not preponderate against the trial court's determination that Mr. Clark's confession was voluntary.

**IV.**

In addition, Mr. Clark challenges the trial court's decision to admit evidence that he possessed and viewed adult pornography. This evidence had been excluded from Mr. Clark's first trial. However, after Mr. Clark obtained permission to present expert testimony during his second trial that he was predisposed to make a false confession to his domineering wife, the trial court granted the State's request to introduce evidence that Mr. Clark viewed pornography despite his wife's vehement moral objections. The State purportedly offered

this evidence solely to prove that Mr. Clark was not as submissive to his wife as Dr. Walker's proposed testimony suggested.

Even though the trial court believed that the evidence of Mr. Clark's predilection for pornography was "not technically [Tenn. R. Evid.] 404(b) . . . prior bad acts" evidence, it decided that giving a limiting instruction regarding this evidence would be appropriate. Accordingly, the trial court instructed the jury that the evidence could not be used as "propensity" or "predisposition" evidence and that its use was limited to providing "a more complete picture of the parties' relationship" and for "evaluating their credibility." At trial, the jury was never shown any pornographic images. They only heard about Mr. Clark's pornography use through the audio recordings and the testimony of Ms. Clark, Detective Gish, and Mr. Clark.

The Court of Criminal Appeals held that the trial court erred by allowing the State to present the pornography evidence during its case-in-chief. The court determined that the pornography evidence qualified as "'other acts' evidence under [Tenn. R. Evid.] 404(b)" which "had the potential for misuse by the jury as propensity evidence." The court also concluded that when the evidence was offered during the State's case-in-chief, it was "not material, and its probative value was outweighed by the danger of unfair prejudice." However, the appellate court determined that the evidence "became relevant and material" after Dr. Walker testified and that "at that point, the danger of unfair prejudice did not outweigh its probative value." Accordingly, the court decided that the evidentiary error was harmless. *State v. Clark*, 2012 WL 3861242, at *31-33.

We must now determine whether admitting the evidence relating to Mr. Clark's predilection for pornography was error and if so, whether that error was harmless. To assess this issue, we must review how this evidence was used at trial.

**A.**

Ms. Clark discussed her husband's pornography use when she testified during the State's case-in-chief. She testified that she had trouble believing Mr. Clark when he initially denied touching their daughters because he had been deceptive in the past. She stated that "[w]e had had, for many years, a problem with his use of pornography" and that "I told him it offended me, that I wished that he would not use pornography on the computer, I felt like it . . . could possibly open the door to other things."

According to Ms. Clark, Mr. Clark would "lie to [her] face" and say he had stopped, but then she would later find pornographic material on his computer. Ms. Clark also told the jury that when she returned home after Mr. Clark's arrest, she checked the computer and

-14-

found pornographic websites in the recent internet history. In addition, Ms. Clark made a subsequent reference to "the distrust with the pornography issue."

Detective Gish testified regarding the results of his forensic examination of Mr. Clark's computers. He told the jury that although Mr. Clark's home computer contained no child pornography, he found "thousands of images" of adult pornography and "thousands" of visits to pornographic websites. He explained that Mr. Clark had not downloaded any pornographic images; the images had been automatically preserved in his computer's internet history cache. Detective Gish testified that the most recent visits to pornographic websites found on Mr. Clark's computer occurred on January 15, 2007 – the day after his wife and children left. Detective Gish also testified that there were "so many images" and websites, he only collected a "representative sample" to attach to his report to Detective Zoccola and the District Attorney General's office.

During his testimony, Detective Zoccola introduced the recordings of the controlled telephone call and the conversation in Ms. Clark's automobile, both of which contained references to Mr. Clark's predilection for pornography. Early in the telephone call, Mr. Clark himself told Ms. Clark that the only "problem" in their marriage had been his habit of looking at free pornography - "just men and women on the internet." He recounted how Ms. Clark had caught him and scolded him. He also told her that he "took a long time off from [pornography]," but then their "sex life got boring," and he started using it again and got caught again.

During the conversation, Ms. Clark revealed that she had checked the computer again within the past week and found that Mr. Clark had been using pornography. Mr. Clark acknowledged that he had but denied he had viewed child pornography. He added that his mother also knew about his pornography problem. He said, "[t]he only thing I have done, I have jacked off to pornography – adult pornography – on our computer." He also insisted that he had never rented or owned any pornographic videos.

Mr. Clark's pornography use was discussed even more extensively during the recorded conversation in Ms. Clark's car at Opry Mills. The jury heard Mr. Clark explain how his pornography use related to the molestation of his daughters:

> Mr. Clark: Just let me talk. You just listen.
> Mrs. Clark: Okay.
> Mr. Clark: You know that, um, over the last couple of years you've seen on the computer that I've looked at porn at night.
> Mrs. Clark: Um-hum. (Affirmative).

-15-

| | |
|---|---|
| Mr. Clark: | And sometimes I get these thoughts . . . not dark or troubled thoughts, just, you know, thinking about sex, you know? |
| Mrs. Clark: | Um-hum. |
| Mr. Clark: | And I, uh, never had any kind of impulse or inclination to do anything to the kids until about one night last week, whenever it was, when they were up there taking a bath in their bathtub. I was, I was up there. They were both in the bathtub. I remember this. I looked at [H.C.]. You know how she'll spread her legs? |
| Mrs. Clark: | Um-hum. |
| Mr. Clark: | She did that and I looked at her vagina, and . . . I was thinking to myself, you know, what are you doing? |

Mr. Clark went on to explain that "what brought it on" was how he would stay downstairs late at night while Ms. Clark was asleep. He said, "I'm looking on the computer at topless women, at, you know, pornography, and it just kind of . . . comes out. I don't know why. I can't explain it." Mr. Clark told Ms. Clark that molesting his daughters was "an impulse thing." He told her that if she checked she would indeed find pornography on the computer. Although he was not usually sexually interested in children, Mr. Clark explained, "I just had an impulse where it was an opportunity for me to do that and I did it and I'm sickened by it and one hundred percent ashamed."

Mr. Clark himself also discussed his use of pornography during his testimony. He told the jury that despite the State's evidence, pornography was actually a "very minimal" part of his life. He said the reason his computers contained so many images and web page visits was because the computers were several years old, and he did not know how to delete that material from his computer's memory.

On cross-examination, the prosecutor suggested that, although Mr. Clark testified he was upset that his children had vanished, he was not "too upset . . . to get online and start looking at porn" on Monday, the first day they were gone. The prosecutor also asked Mr. Clark to acknowledge that he had been "exceedingly deceitful" with his wife "on this issue of pornography." The prosecutor said, "despite the fact that she had a zero tolerance of it, and you knew it hurt her, you continued to do it. . . . And you lied about it. . . . And she stayed with you and the issue came up again, again, and again. And you lied again, again, and again, right?" Mr. Clark answered, "Yes, I didn't think that would end our marriage, something like that."

Both the prosecution and the defense referred to the evidence of Mr. Clark's predilection for pornography during their closing arguments. The State suggested that Ms. Clark's mistrust of her husband was reasonable because "he had lied to her about . . . using the porn over and over and over again." The State also noted that although Mr. Clark testified that the sudden disappearance of his wife and children made him very upset, he actually continued to "keep up with his interests" while they were gone and that "looking at porn" was one of these interests.

For his part, Mr. Clark's attorney argued to the jury that the State was committing "character assassination" against Mr. Clark by branding him with "the scarlet letter" or "leper bell" of adult pornography and that the State was suggesting that Mr. Clark's pornography use put him on the "slippery slope of child molestation." In its rebuttal, the State responded:

> [Mr. Clark's counsel alleged] there was an issue of character assassination with the pornography that was involved in this case. I submit to you that pornography is not important in and of itself. Don't convict Chad Clark because he looked at pornography. The issue of pornography came into play because it was about deception. If Mr. Clark had been hiding a gambling problem or hiding a drinking problem or a drug problem from Mrs. Clark, that's what you would have heard about because that deception was important to Mrs. Clark in insisting on the truth. So, I don't care if he looked at pornography and neither should you because it doesn't matter in and of itself, it matters in the context of he lied to her about it and she knew it.

**B.**

Against this factual backdrop, we now turn to the law governing the admissibility of evidence of a criminal defendant's use of pornography that is not directly related to the charges against him. We generally review evidentiary rulings under an "abuse of discretion" standard. However, when we consider evidence that implicates Tenn. R. Evid. 404(b), we review the trial court's admissibility ruling de novo unless the trial court substantially complied with the procedures outlined in Rule 404(b). If the trial court substantially complied with Tenn. R. Evid. 404(b), we will overturn the ruling only if the trial court abused its discretion. *State v. Kiser*, 284 S.W.3d 227, 288-89 (Tenn. 2009); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

-17-

When a trial court errs by admitting evidence that is forbidden under the Tennessee Rules of Evidence, we address this non-constitutional error using the harmless error analysis of Tenn. R. App. P. 36(b). Under Tenn. R. App. P. 36(b), the defendant bears the burden of showing that the erroneous evidence "more probably than not" affected the verdict. To conduct a review under Tenn. R. App. P. 36(b), we review the entire record in order to ascertain the actual evidentiary basis for the jury's verdict. The crucial consideration is what impact the error may reasonably have had on the jury's decision-making process. When the error more probably than not had a substantial and injurious impact on the jury's decision-making process, it is not harmless. In general, the more evidence there is to support the defendant's guilt, the more likely it will be that the error was harmless. *State v. Rodriguez*, 254 S.W.3d at 371-72.

The admissibility of any piece of evidence depends on its relevance. Tenn. R. Evid. 402 provides that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

However, even relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Tenn. R. Evid. 404 balances the admissibility of relevant evidence with the concerns that "a person's character or trait of character"[8] or "[o]ther crimes, wrongs, or acts"[9] may have the potential to influence the jury's assessment of the person's character. Tenn. R. Evid. 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1)     The court upon request must hold a hearing outside the jury's presence;

---

[8]*See* Tenn. R. Evid. 404(a).

[9]*See* Tenn. R. Evid. 404(b).

(2)	The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3)	The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4)	The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

According to the Advisory Commission Comment, "evidence of other crimes should usually be excluded." However, in "the exceptional case," another crime, wrong or act could be "arguably relevant to an issue other than the accused's character." Such relevant issues include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404 advisory comm'n cmt. We have also held that evidence of other acts may be admissible to provide the jury with the necessary contextual background or *res gestae* to understand the nature of the crime. *State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000) (providing guidelines for admitting *res gestae* evidence).

Evidence offered for the purpose of showing "conformity with [a particular] character trait" is often called propensity evidence. Courts must closely scrutinize propensity evidence not because such evidence is irrelevant, but because juries tend to ascribe it undue relevance. Propensity evidence may lead a jury to convict, not because they are certain the defendant is guilty of the charged crime, but because they have determined the defendant is "a bad person who deserves punishment" whether or not the crime was proven beyond a reasonable doubt. *State v. Rodriguez*, 254 S.W.3d at 375; *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)); *see also United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc). The danger of a jury misusing propensity evidence is particularly strong when "the conduct or acts are similar to the crimes on trial." *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994).

Although the pornography Mr. Clark used was legal,[10] the admissibility of evidence concerning a defendant's pornography use is governed by Tenn. R. Evid. 404(b). *See State*

_____

[10]Adults have a First Amendment right to view and possess pornography (defined as writings, pictures, and other media that are intended primarily to arouse sexual desire) unless the pornography falls into one of two categories of unprotected speech: obscenity or child pornography. *See* David L. Hudson, Jr., *The First Amendment: Freedom of Speech* § 4:1, at 87 (2012). The parties agree that neither category is implicated in this case.

*v. Rodriguez*, 254 S.W.3d at 374; *State v. McCary*, 119 S.W.3d 226, 246 (Tenn. Crim. App. 2003), *perm. app. denied* (Tenn. July 7, 2003).  While using adult pornography is not a "crime," many people consider it a moral "wrong."  Although we have previously explained that only prior "bad acts" implicate Tennessee's Rule 404(b), *see State v. Reid*, 213 S.W.3d 792, 813-14 (Tenn. 2006) (finding that handgun possession is not a bad act that warrants Rule 404(b) analysis), pornography use has such prejudicial potential that it should be addressed through Rule 404(b).

Caution is especially warranted in trials for sex crimes because a jury may infer from a defendant's use of pornography that the defendant had the propensity to engage in other morally questionable sexual behaviors.  *See, e.g.*, *State v. Montgomery*, 350 S.W.3d 573, 582-85 & n.3 (Tenn. Crim. App. 2011) (opining that had the victim testified that the defendant showed her pornography, this testimony would have been inadmissible for the same reason that evidence of uncharged sexual acts between the defendant and victim would be inadmissible) (No Tenn. R. App. P. 11 application filed); *State v. McCary*, 119 S.W.3d at 246 (finding that photocopied covers of the defendant's pornographic magazines that were not connected to the charged sex crimes should have been excluded because they held "limited probative value" other than as propensity evidence and "would likely engender substantial prejudice"), *perm. app. denied* (Tenn. July 7, 2003); *State v. Woodcock*, 922 S.W.2d 904, 911 (Tenn. Crim. App. 1995) (expressing "no doubt that evidence of a defendant's sexual misconduct not charged in the indictment and not connected to any of the charges in the indictment is inadmissible during the State's case-in-chief under Tennessee Rule of Evidence 404(b)").

Four years ago, this Court warned against the acute danger of sexually-charged propensity evidence in a prosecution for child sexual abuse.  In *State v. Rodriguez*, we noted that in addition to the dangers posed by propensity evidence in general, "[t]here is no subject which elicits a more passionate response than the sexual exploitation of children.  Society abhors, and rightfully so, the victimization of the defenseless child." *State v. Rodriguez*, 254 S.W.3d at 376 (quoting *United States v. Villard*, 700 F. Supp. 803, 809 (D.N.J. 1988)).  Like this case, *State v. Rodriguez* involved a prosecution for child rape and aggravated sexual battery against two children.  Although the State did not offer any pornographic images into evidence, the court permitted oral testimony that Mr. Rodriguez viewed child pornography on his computer.  We held that admitting this testimony was harmful error that warranted a new trial.  *State v. Rodriguez*, 254 S.W.3d at 377-78.

We also stressed that propensity evidence is especially harmful in close cases, such as those that hinge on the credibility of the witnesses:

> The harmful effects of propensity evidence that undermines a defendant's credibility increase in close cases when the outcome depends on the jury's assessment of the witnesses' credibility. Errors in admitting evidence are less likely to be harmless in close cases. Propensity evidence affects the jury's assessment of whom to believe in a case that rises and falls upon assessments of credibility. This danger is particularly acute where the character or credibility defect is one that garners the understandable . . . revulsion that is directed by the public towards sexually exploitative acts towards children . . . .

*State v. Rodriguez*, 254 S.W.3d at 377 (citations omitted). The only substantive evidence at trial that Mr. Rodriguez sexually abused the two children was the testimony of the children themselves. Thus, we said, "the outcome of the prosecution hinged on the jury's assessment of the credibility of the two children and of [the defendant]." *State v. Rodriguez*, 254 S.W.3d at 377. We determined that hearing about Mr. Rodriguez's possession of child pornography probably made it easier for the jury to disbelieve the defendant's denials and "freed the jury to conclude more comfortably" that he had abused his stepchildren. The error thus undermined the fairness of the trial and "more probably than not" affected the jury's assessment of the credibility of the witnesses, which was the pivotal issue. *State v. Rodriguez*, 254 S.W.3d at 377.

In this case, Mr. Clark proposed to offer his own character evidence through Dr. Walker, and the State petitioned to use the pornography evidence to "rebut" that evidence. Tenn. R. Evid. 404(a)(1) permits a defendant to offer character evidence, but then authorizes the prosecution to offer its own evidence of the defendant's character "to rebut" the defendant's character evidence. We do not believe this Rule provides for preemptive rebuttals. Here, the trial court allowed the State to introduce the pornography evidence during its case-in-chief, in anticipation that Mr. Clark would raise the issue of his submissiveness to his wife during the defense's case-in-chief.

There is danger in this approach. A defendant is not required to present any proof at all. *See* Tenn. Code Ann. § 39-11-201(a)-(c) (2010) (codifying the constitutional rules that a criminal defendant is presumed innocent and has no burden to prove innocence, thus the State must prove each element of the crime beyond a reasonable doubt). Accordingly, a defendant who gives notice of a potential expert or any other witness may, at the close of the State's case, change course and decide to refrain from presenting that evidence. It follows that trial courts ought not permit the State to offer evidence during the State's case-in-chief when that evidence is only potentially admissible for the purpose of rebutting the defendant's anticipated evidence. With this problem in mind, we now turn our focus to Rule 404(b).

-21-

# C.

Because evidence of use of pornography must pass muster under Tenn. R. Evid. 404(b), we address first whether the trial court substantially complied with the rule. Although it is not clear from the record whether the trial court relied on Tenn. R. Evid. 404(b) in determining the admissibility of the pornography evidence, it appears that the court substantially complied with Rule 404(b)'s procedural requirements. As required by Tenn. R. Evid. 404(b)(1), the court considered the admissibility of the pornography evidence outside the presence of the jury. Although the court did not expressly state that the evidence of Mr. Clark's pornography use was "clear and convincing," as required by Tenn. R. Evid. 404(b)(3), this hurdle is easily cleared because Mr. Clark freely admitted using adult pornography throughout the investigation and trial. The court also decided that "any prejudicial effect [the evidence] may potentially have" was "outweighed by its probative value." *See* Tenn. R. Evid. 404(b)(4).

The remaining requirement under Tenn. R. Evid. 404(b) is subsection (2)'s requirement that the court identify a "material issue . . . other than conduct conforming to a character trait." The material issue the trial court identified in this case was the issue of Mr. Clark's submissiveness to his wife. The court found the evidence was relevant because "one of the bases" for Dr. Walker's conclusion that Mr. Clark was highly suggestible was Dr. Walker's opinion that Ms. Clark was "the dominant party" in the marriage. The court cited Dr. Walker's opinion that Mr. Clark "kind of gives in to whatever her opinions are on things in order to avoid conflict," and that "he basically succumbs to her desires [and] demands." In light of this defense theory, the court determined that Mr. Clark's "subversive" continuing use of pornography went to "the issue of whether or not he was the submissive partner." Thus, as required by Tenn. R. Evid. 404(b)(2), the trial court stated on the record this issue, its ruling on the issue, and its reasons for admitting the evidence.

We note first that this "material issue" is not one of the issues listed in the Advisory Committee Comment to Tenn. R. Evid. 404 – identity, motive, common scheme or plan, intent, or rebuttal of accident or mistake. Nor did the State offer the pornography evidence as *res gestae* contextual background evidence.[11] The State never argued that one of these established non-character exceptions to Tenn. R. Evid. 404(b)'s exclusion rule applied in Mr. Clark's case.

---

[11] One could argue that a portion of the court's instruction – that the jury could consider the evidence "for the limited purpose of providing a more complete picture of the parties' relationship" – painted the pornography evidence as *res gestae* evidence, but the State did not rely on this theory before trial, and the court did not conduct the *res gestae* analysis required by *State v. Gilliland*, 22 S.W.3d at 272.

We are not suggesting that Tenn. R. Evid. 404(b) evidence must fit within one of the enumerated categories in the Advisory Committee Comments (i.e., identity, motive, common scheme or plan, intent, or rebuttal of accident or mistake) or be fairly characterized as *res gestae* evidence. There very well may be other types of "other acts" that meet Tenn. R. Evid. 404's criteria. Nevertheless, whenever a party offers Tenn. R. Evid. 404(b) evidence without connecting the evidence with one of the recognized exceptions, courts should be highly skeptical.

Regardless of whether the trial court identified a legitimate "material issue" under Tenn. R. Evid. 404(b)(2) and therefore substantially complied with the Rule, we find that the trial court abused its discretion in two ways. First, the court based its decision on an erroneous assessment of the evidence when it decided that the probative value of the evidence was not "outweighed by the danger of unfair prejudice." Second, the court created an injustice to the complaining party when it allowed the evidence to be used primarily to attack Mr. Clark's credibility. *See State v. Banks*, 271 S.W.3d at 116 ("Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.").

First, the trial court made an erroneous assessment of the effect of the evidence when it found that the probative value of the pornography evidence was not outweighed by the danger of unfair prejudice. As we have previously cautioned, the "use of pornography" evidence carries a high potential for unfair prejudice – especially in sex crimes cases, and even more so in cases involving sex crimes against children. *State v. Rodriguez*, 254 S.W.3d at 376; *State v. McCary*, 922 S.W.2d 511, 515 (Tenn. 1996). A jury can easily misuse such evidence as propensity evidence.

Because Mr. Clark covertly persisted in what his wife considered to be sexual misconduct (use of pornography), the jury could have inferred that Mr. Clark was similarly inclined to commit more serious sexual misconduct in secret and against his wife's wishes, e.g., molesting their daughters in the night. Indeed, Ms. Clark herself articulated her fear that the pornography would "open the door to other things." Thus, the trial court abused its discretion in finding that the prejudicial effect of this volatile evidence did not outweigh its minimal probative value.

Second, the State used the evidence of Mr. Clark's pornography use to impugn his character for truthfulness, and the trial court's instructions prompted the jury to consider the evidence for that purpose even though it is impermissible. As we have explained, evidence

of other crimes, wrongs, or acts is not generally admissible for the purpose of impugning the defendant's credibility.[12]

Testifying for the State, Ms. Clark stated that Mr. Clark had been "deceptive" about his use of pornography "for many years" and that the way he lied "to [her] face" made her "distrust" him. During its cross-examination of Mr. Clark, the State characterized him as being "exceedingly deceitful" and asked him if he had "lied about [his use of pornography] again, again, and again." In its closing arguments, the State did not argue that the evidence of Mr. Clark's use of pornography contradicted Dr. Walker's diagnosis or even that it provided a more complete picture of the Clarks' relationship. Rather, the State insisted that the evidence was all about "deception."

The trial court's limiting instruction prompted the jury to consider the evidence for the purpose of "evaluating [the parties'] credibility." Because juries are presumed to follow a trial court's instructions, *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011), we presume that the jury in this case considered Mr. Clark's use of pornography to assess his character for truthfulness. This is a case in which Mr. Clark's credibility was essentially an issue of character. Erroneously admitting credibility character evidence in a "close case" – where credibility is the sole issue – is error. *State v. Rodriguez*, 254 S.W.3d at 377.

In summary, we find (1) that the evidence of Mr. Clark's use of pornography posed a danger of being used as propensity evidence (suggesting that Mr. Clark was a sexually immoral person), (2) that the State chiefly used the evidence to impugn Mr. Clark's character for truthfulness, and (3) that the trial court's instruction had the same effect. Thus, the portion of the trial court's limiting instruction that directed the jury to use the pornography evidence to assess the parties' "credibility" was unfair to Mr. Clark because it encouraged the jury to consider the evidence regarding his use of pornography for an improper purpose.

---

[12]We note that the State could have offered this evidence as impeachment evidence under Tenn. R. Evid. 608, although such evidence could not be offered during the State's case-in-chief. Tenn. R. Evid. 404(a)(3) establishes that one exception to the general ban on character evidence is evidence to reveal "the character of a witness as provided in Rules 607, 608, and 609." Rule 607 establishes that any party may attempt to impeach the character of a witness. Rule 608 provides the limitations and procedures that apply to impeachment evidence. Rule 609, inapplicable here, pertains to impeachment by evidence of conviction of a crime. Therefore, under these Rules, after Mr. Clark took the stand, the State could have cross-examined him regarding specific instances of his prior conduct "for the purpose of attacking or supporting [Mr. Clark's] character for truthfulness" – assuming the proper procedures were followed. Tenn. R. Evid. 608(b).

**D.**

Determining that the trial court erred by admitting the evidence relating to Mr. Clark's use of pornography and instructing the jury that it could consider this evidence to evaluate the parties' credibility does not end our inquiry. We must also decide whether these errors were harmless in the context of this case.

Determining whether evidence "more probably than not" affected the jury's decision-making process can be a difficult question.

In searching for an answer, we have found it helpful to compare this case with *State v. Rodriguez*. Like the *Rodriguez* case, this case involves allegations that a close relative sexually abused two children. The children testified in both cases, although the testimony in *Rodriguez* was more detailed. Both cases included oral trial testimony that the defendant viewed pornography. But while the *Rodriguez* cased involved the defendant's use of illegal child pornography, the evidence in this case involved the use of adult pornography which is not illegal. Unlike Mr. Rodriguez, Mr. Clark confessed to the molestations. Unlike the *Rodriguez* case, in which the State offered the pornography evidence for the propensity purpose of showing the defendant had "a thing for children," the State in this case offered a non-propensity reason for proffering the evidence. Especially in light of the fact that Mr. Clark made recorded admissions of guilt, there are substantive grounds to distinguish this case from *State v. Rodriguez*.

In *State v. Rodriguez*, the pornography evidence indirectly impugned the defendant's credibility and probably affected the jury's verdict because the case boiled down to the jury's weighing the defendant's testimony against the testimony of his victims. *State v. Rodriguez*, 254 S.W.3d at 377. Mr. Clark's case, however, includes a detailed confession. This confession changes the harmless error calculus. Although the State used the pornography evidence to portray Mr. Clark as a serial liar, the harmfulness of that evidence is blunted by the existence of other evidence that Mr. Clark had not always told the truth. Either Mr. Clark lied in his confession or he lied when he retracted his confession. The jury knew Mr. Clark had been untruthful one way or the other. Its task was to determine whether his confession or his retraction was the truth. For this reason, presenting additional evidence that Mr. Clark was capable of lying was unlikely to affect the jury's decision-making process.

Determining the harmfulness of erroneously admitted evidence also depends on the strength of the evidence as a whole. *See State v. Rodriguez*, 254 S.W.3d at 371-72. In this case, the jury heard recordings in which Mr. Clark confessed in detail to digitally penetrating his daughters' private parts over several months. As the State pointed out in its rebuttal arguments, Mr. Clark's admissions closely tracked the girls' testimony. During their recorded conversations, Ms. Clark encouraged her husband to admit to other acts such as

having genital intercourse with the girls and masturbating in front of them. Had his confession been a fabrication designed solely to assuage his wife, Mr. Clark might well have admitted these behaviors. Mr. Clark, after all, did not know what his daughters had said about him. Instead, Mr. Clark admitted only to digitally penetrating his daughters, which is precisely what they accused him of doing. A jury would likely have inferred that the reason Mr. Clark confessed to the same sort of activities his daughters reported was because he actually did them.

Therefore, the State's evidence in this case was considerably stronger than the State's evidence in *State v. Rodriguez*. In light of the fact that the jury knew Mr. Clark was capable of lying and the fact that the trial court and the prosecution counseled the jury not to use the evidence as propensity evidence for sexual misconduct, we find it unlikely that the erroneous testimony concerning Mr. Clark's pornography use had a "substantial and injurious" impact on the jury's decision-making process. *State v. Rodriguez*, 254 S.W.3d at 372 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Mr. Clark has not carried his burden of proving that the evidence was harmful under Tenn. R. App. P. 36(b).

This opinion should not be misconstrued as granting the State license to introduce evidence of adult pornography use in trials for sex crimes. The error in this case barely clears the harmless error hurdle. Had Mr. Clark's confession been any less compelling, we would have reversed his convictions.

## V.

Finally, Mr. Clark argues the trial court committed reversible error by instructing the jury that the mental state of "recklessness" satisfied all the elements of aggravated sexual battery and rape of a child. Mr. Clark argues this error "impermissibly lowered the State's burden of proof." We find that the trial court's instructions relating to rape of a child were accurate and clear. Although we recommend that future courts use more precise instructions for aggravated sexual battery, we find no reversible error in the instructions to this jury.

## A.

Defendants in criminal cases have a constitutional right to a correct and complete charge of the law. *State v. Dorantes*, 331 S.W.3d at 390; *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010) (quoting *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001)). Accordingly, trial courts have a duty in all criminal cases to instruct the jury on the general principles of law applicable to the facts of the case. *State v. Thompson*, 285 S.W.3d 840, 842 n.1 (Tenn. 2009) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999). As part of their instructions in criminal cases, trial courts

must describe and define each element of the offense or offenses charged. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *State v. Cravens*, 764 S.W.2d 754, 756 (Tenn. 1989).

Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness. *See State v. Hawkins*, 406 S.W.3d at 128; *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011). While the pattern jury instructions are frequently used as a source for jury instructions in criminal cases, *State v. Davis*, 266 S.W.3d 896, 901 n.2 (Tenn. 2008), they are not entitled to greater deference than the other instructions given by the trial court, *see State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008)).

When called upon to review the adequacy of a particular jury instruction, reviewing courts should view the instruction in the context of the charge as a whole. *State v. Rimmer*, 250 S.W.3d at 31; *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). When a challenged instruction was so erroneous that the instruction alone infected the entire trial and resulted in a conviction that violates due process, *State v. James*, 315 S.W.3d at 446 (quoting *State v. Rimmer*, 250 S.W.3d at 31), or when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law, *State v. Majors*, 318 S.W.3d at 864 (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)), such deficiencies are prejudicial error that require reversal.

The defendant's mental state, or "*mens rea*," is a material element of the crimes of aggravated sexual battery and rape of a child. Accordingly, the failure to properly instruct the jury on a material element of an offense is a non-structural constitutional error. When such an error occurs, the conviction must be reversed unless the State can prove beyond a reasonable doubt that the error was harmless. *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013); *State v. Hawkins*, 406 S.W.3d at 128.

Not every statutory crime contains a specific required mental state. *See State v. Page*, 81 S.W.3d 781, 786 (Tenn. Crim. App. 2002) (observing that criminal statutes generally define the applicable mental state) (No Tenn. R. App. P. 11 application filed). Accordingly, the Tennessee Code contains a generic *mens rea* statute. Under Tenn. Code Ann. § 39-11-301(c) (2010), whenever a statutory offense does not specify a mental element, then "intent, knowledge or recklessness suffices to establish the culpable mental state." *See also State v. Page*, 81 S.W.3d at 786 (stating that "[i]f a culpable mental state is not specified [in the statute defining the offense], then intentional, knowing, or reckless will generally suffice").

**B.**

We turn first to the crime of rape of a child. In the past, the Court of Criminal Appeals has lacked unanimity concerning the mental states necessary to convict a person of rape of a child. *See State v. Lynn*, No. M2008-00532-CCA-R3-CD, 2009 WL 1812419, at *5 (Tenn. Crim. App. June 25, 2009) (acknowledging a split of authority regarding the *mens rea* for rape of a child), *perm. app. denied* (Tenn. June 19, 2012); *State v. Williams*, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920 (Tenn. Crim. App. Nov. 29, 2006) (split opinion concerning rape of a child) (No Tenn. R. App. P. 11 application filed). We therefore take this opportunity to resolve the question.

Tenn. Code Ann. § 39-13-522(a) defines the two elements of this class-A felony:

> (a) Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age.

This definition contains no mental state for either element. Accordingly, the Thirteenth Edition of the Tennessee Pattern Jury Instructions invokes the generic *mens rea* statute.

In this case, relying on 7 Tennessee Pattern Jury Instructions – Criminal § 10.12 & cmt. 2 (13th ed. 2009), the trial court instructed the jury that Mr. Clark could be found guilty of this crime only if the State proved beyond a reasonable doubt that "he acted either intentionally, knowingly, or recklessly." In accordance with the Pattern Jury Instruction Committee's comments on this offense, the trial court's instructions also defined the terms "intentionally, knowingly, or recklessly," tracking the definitions found in Tenn. Code Ann. § 39-11-302(a)-(c) (2006).

We find that the jury was properly instructed. The first element of rape of a child is the *actus reus* – "unlawful sexual penetration." Because Tenn. Code Ann. § 39-13-522(a) does not contain a specific mental state for this offense, the generic *mens rea* statute fills in the gap. The unlawful sexual penetration may be done intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-11-301(c).[13] Moreover, the "sexual penetration" element

---

[13]*See also State v. Barney*, 986 S.W.2d 545, 550 (Tenn. 1999) ("Rape of a child requires sexual penetration of the victim, and the mental state required may range from intentional to knowing or reckless."); *State v. Hill*, 954 S.W.2d 725, 729 (Tenn. 1997) ("Obviously, the act for which the defendant is indicted, 'unlawfully sexual penetrat[ing]' a person under the age of thirteen, is committable only if the principal (continued...)

relates both to the nature of the conduct and to the result of the conduct. *State v. Higgins*, No. E2006-01552-CCA-R3-CD, 2007 WL 2792938, at \*10 (Tenn. Crim. App. Sept. 27, 2007) (No Tenn. R. App. P. 11 application filed); *State v. Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at \*13 (Tenn. Crim. App. Nov. 30, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005). The "reckless" *mens rea* can apply to the circumstances surrounding a defendant's conduct or to the result of the defendant's conduct. *State v. Page*, 81 S.W.3d at 787. Because the act of sexual penetration relates to the result of the defendant's conduct, the culpable mental state of recklessness is sufficient to support a conviction for rape of a child.[14] Because recklessness is a sufficiently culpable mental state to support a conviction for rape of a child, *ipso facto* the more-culpable mental states of knowing and intentional may also support such a conviction.

The second element of rape of a child – the fact that "the victim is more than three (3) years of age but less than thirteen (13) years of age" – is a circumstance surrounding the conduct. Again, the statute defines no mental state specific to this element. The generic *mens rea* statute again fills the gap. Because the "reckless" *mens rea* may properly be applied to "the circumstances surrounding [a] defendant's conduct or the result of [the] defendant's conduct," *State v. Page*, 81 S.W.3d at 787, a defendant may satisfy this element when he or she is reckless, knowing, or intentional regarding the attendant circumstance of the age of the victim. *See State v. Blanton*, No. M2007-01384-CCA-R3-CD, 2009 WL 537558, at \*14 (Tenn. Crim. App. Mar. 4, 2009) ("[R]eckless conduct is sufficient for the element that the victim is less than thirteen years old."), *perm. app. denied* (Tenn. Aug. 24, 2009).

We therefore find that, regarding the crime of rape of a child, a court accurately instructs the jury when it presents the elements of the crime, Tenn. Code Ann. § 39-13-522(a), and instructs the jury that it may find the defendant guilty if the State has proven beyond a reasonable doubt that the defendant acted recklessly, knowingly, or intentionally in relation to both elements of the offense. *See State v. Branch*, No. M2005-01125-CCA-R3-CD, 2006 WL 1932705, at \*5-6 (Tenn. Crim. App. July 10, 2006) (upholding almost identical instructions regarding rape of a child), *perm. app. denied* (Tenn. Nov. 6, 2006).

---

[13](...continued) actor's *mens rea* is intentional, knowing, or reckless.").

[14]In *State v. Womack*, No. E2003-02332-CCA-R3-CD, 2005 WL 17428, at \*8-9 (Tenn. Crim. App. Jan. 4, 2005) (No Tenn. R. App. P. 11 application filed), the Court of Criminal Appeals determined that the "reckless" *mens rea* may not apply to "sexual penetration" under the aggravated rape statute. However, we agree with the analysis in *State v. Walters*, 2004 WL 2726034, at \*12-14. *Womack* is overruled on this point.

## C.

We now turn to aggravated sexual battery, which is a bit more complicated.  Tenn. Code Ann. § 39-13-504(a) defines this class-B felony.  The relevant elements in this case are:

> unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
> . . . .
> (4) The victim is less than thirteen (13) years of age.

Again, the statute provides no specific mental state.  As with rape of a child, the fact that the victim is less than thirteen years old is a circumstance surrounding the crime.  Because any of the three mental states listed in Tennessee's generic *mens rea* statute may be properly applied to a "circumstance[] surrounding the crime," *State v. Page*, 81 S.W.3d at 787, a defendant may violate this element of the statute by acting recklessly, knowingly, or intentionally.  *See* Tenn. Code Ann. § 39-11-301(c).

The statutory *actus reus* of this crime differs from the *actus reus* of rape of a child in a significant respect.  Where rape of a child requires "unlawful sexual penetration," aggravated sexual battery requires "unlawful sexual contact."  This difference is significant because a separate statute, Tenn. Code Ann. § 39-13-501(6), defines the term "sexual contact:"

> As used in §§ 39-13-501 – 39-13-511, except as specifically provided in § 39-13-505, unless the context otherwise requires:
> . . . .
> (6) "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

First, this statutory definition explicitly applies to Tenn. Code Ann. §§ 39-13-501 through -511 – a range which includes aggravated sexual battery in Tenn. Code Ann. § 39-13-504(a).  Second, this statutory definition at Tenn. Code Ann. § 39-13-501(6) denotes both a specific *actus reus* and a specific *mens rea*.  "Sexual contact" constitutes "intentional touching."  The *actus reus* – "touching" someone's "intimate parts" or the clothing

-30-

immediately covering the intimate parts – must be done intentionally. Not only must the defendant's mental state be "intentional," but the intent must be reasonably construed as "for the purpose of sexual arousal or gratification."

Because this statutory definition found in Tenn. Code Ann. § 39-13-501(6) is more specific than the generic *mens rea* statute, and because the definition explicitly applies to aggravated sexual battery, we find that the "sexual contact" element of aggravated sexual battery may only be satisfied if the defendant's conduct was "intentional." Although the second element of aggravated sexual battery at issue in this case (the age of the victim) derives its *mens rea* from the generic *mens rea* statute, the first element (unlawful sexual contact) derives its mental state from Tenn. Code Ann. § 39-13-501(6)'s definition of "sexual contact." In this case, the specific trumps the general in regard to the first element of aggravated sexual battery.

We now consider whether the trial court's instructions adequately informed the jury that to convict they must find that Mr. Clark (1) intentionally touched his victim's private areas in a way that could be reasonably construed as for the purpose sexual arousal or gratification, and that (2) his victim was less than thirteen years old – an attendant circumstance toward which he could act recklessly, knowingly, or intentionally. The trial court's instructions are based on 7 Tennessee Pattern Jury Instructions – Criminal § 10.03 (13th ed. 2009). The court instructed the jury:

> For you to find Fred Chad Clark, II guilty of aggravated sexual battery, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
> (l) that he had unlawful sexual contact with the alleged victim. . ., in which the defendant intentionally touched her intimate parts or the clothing covering the immediate area of her intimate parts; and
> (2) that [the victim] was less than thirteen (13) years of age; and
> (3) that he acted either intentionally, knowingly or recklessly.

As Mr. Clark points out, the way this instruction was structured created a potential for juror confusion concerning the applicable mental states. Regarding element (1), the jury instruction specifies that the "sexual contact" must have been an intentional touching. As we have explained, this core *actus reus* element of aggravated sexual battery must carry an intentional mental state. However, element (3) of the jury instructions recites the three mental states from the generic *mens rea* statute in a way that suggests that "intentionally, knowingly, or recklessly" could apply to both elements (1) and (2). As we have explained,

while all three of these mental states may apply to the element of the age of the victim in element (2), element (1) may only be done intentionally.

Determining whether this instruction is erroneous is a close call. Despite the ambiguity, a jury which read these instructions carefully would likely determine that the "sexual contact" element had to be done "intentionally," regardless of the potentially confusing placement of element (3) of the trial court's jury instructions. Because the words "intentionally touched" occur in close proximity to "unlawful sexual contact" in element (1), a reasonable jury would probably interpret this to mean that the more specific *mens rea* of "intentionally" had to apply to the touching/sexual contact, while the broader mental states contained in element (3) applied to all other aspects of the crime.

But we need not determine whether this instruction was erroneous because any error regarding the "reckless" or "knowing" *mens rea* in relation to aggravated sexual battery would be harmless beyond a reasonable doubt. The State's theory was that *all* of Mr. Clark's unlawful conduct was intentional (and for the purpose of sexual arousal or gratification). Because neither the State nor Mr. Clark presented evidence that his behavior might have been done recklessly or knowingly (but not intentionally), the jury had no occasion to consider these lesser mental states in regard to the *actus reus* of aggravated sexual battery. The uncontradicted evidence regarding Mr. Clark's conduct, including his own confession, proved that his conduct was intentional. Even had the jury misunderstood the instructions and believed that "reckless" or "knowing" behavior satisfied the "sexual contact" element of aggravated sexual battery, that misunderstanding would not have prejudiced Mr. Clark in any way. *See State v. Lynn*, 2009 WL 1812419, at *5; *State v. Higgins*, 2007 WL 2792938, at *10; *State v. Walters*, 2004 WL 2726034, at *14.

Nevertheless, we encourage future courts and the Committee on Pattern Jury Instructions to pursue greater precision in explaining the mental states that apply to the separate elements of aggravated sexual battery. Instead of including reckless, knowing, and intentional at the end of the jury instruction as the trial court did in this case, future courts should specify that (1) unlawful sexual contact means intentional touching of the intimate parts or the clothing immediately covering the intimate parts, and that this intentional touching must be reasonably construed as being for the purpose of sexual arousal or gratification; and (2) that the victim was less that thirteen years old, and the defendant acted recklessly, knowingly, or intentionally regarding this fact.

## VI.

Mr. Clark also asks this Court to reverse his conviction on the basis of cumulative error. The cumulative error doctrine embodies the idea that a multiplicity of errors – though individually harmless – may in the aggregate violate a defendant's due process right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). We have found one error in this case, and determined it was harmless. We discussed a second potential error, but determined that even if erroneous it would not have prejudiced Mr. Clark in any way. Therefore, we find no basis for a reversal based on cumulative error.

## VII.

In summary, we find that Mr. Clark's confessions were admissible because they were not involuntary. His confessions were also sufficiently corroborated to support his convictions. The trial court erred by allowing the State to present evidence relating to Mr. Clark's viewing of adult pornography during its case-in-chief, but this error was harmless. While the jury instructions should have been more precise, they did not prejudice Mr. Clark, even if they were erroneous. Accordingly, we affirm the judgment of the Court of Criminal Appeals. The costs of this appeal are taxed to Fred Chad Clark, II and his surety for which execution may issue if necessary.

_____
WILLIAM C. KOCH, JR., JUSTICE