# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 07, 2015 Session

## STATE OF TENNESSEE v. JOSEPH JORDAN

**Appeal from the Criminal Court for Shelby County**
**No. 1104665    James C. Beasley, Jr., Judge**

_____

### No. W2014-01568-CCA-R3-CD  -  Filed February 12, 2016
_____

The defendant, Joseph Jordan, was convicted of rape, a Class B felony, two counts of false imprisonment, Class A misdemeanors, and one count of domestic assault, a Class A misdemeanor.  On appeal,  he argues that the trial court erred by not requiring the State to make an election of offenses; that the evidence is insufficient to sustain his convictions; that the testimony of a witness did not open the door to his prior conviction for domestic assault; that the trial court erred in restricting the testimony of a second witness to impeach the victim; that the trial court erred by instructing the jury regarding the *mens rea* of recklessness for the crime of rape; that the trial court should have instructed the jury regarding the defense of voluntary intoxication; that the trial court erred in admitting evidence of his prior bad acts; that the State committed prosecutorial misconduct in its opening statement; that it was plain error to allow the victim to testify that the defendant was incarcerated; and that his convictions should be reversed under the doctrine of cumulative error.  Following our thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Lance R. Chism (on appeal) and Michael Working (at trial), Memphis, Tennessee, for the Appellant, Joseph Jordan.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla Taylor and Sam Winnig, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## FACTS AND PROCEDURAL HISTORY

The defendant was charged with aggravated rape, two counts of aggravated kidnapping, and one count of domestic assault based upon an incident that occurred in the rented room that the defendant and the victim shared. At the time of the incident, the victim and defendant were in a romantic relationship and were living together. Prior to meeting the defendant, the victim suffered a stroke, which paralyzed the left side of her body, rendered her unable to work, and required her to wear adult diapers. She also was blind in her left eye and required assistance to walk. The victim met the defendant "about four months" after her stroke, and initially, their relationship was "great." However, when the two moved in together, the defendant began to physically and verbally abuse the victim.

The victim testified to a pattern of abusive behavior at the hands of the defendant. She recalled an incident that occurred when she and the defendant were living in Whitehaven where the defendant attempted to start an argument with her. The victim did not wish to fight, and she left the room. The defendant struck her in the back, causing her to fall to the floor. After punching the victim, the defendant called her a "nasty b***h" and a "[n]asty a**ed wh*re." The defendant also would threaten the victim and her family members. He threatened to hit the victim in the mouth hard enough that she would have "to suck out of a straw [for] six to eight weeks" if she told anyone about the mistreatment that she suffered. He also threatened to rape her seven-month-old granddaughter.

The defendant and victim eventually left Whitehaven and moved in with the defendant's mother, Lavella Shaw. At their new residence, the defendant continued his pattern of abusive behavior. The victim testified that on one occasion, the defendant poked his finger into her left eye. The victim shouted, and the defendant threatened to beat her with a stick if someone came to the bedroom door. She stated that the defendant barricaded the door with a dresser to prevent anyone from entering the room.

After living with Ms. Shaw, the two next moved to a boarding house on Marchenell Street, where the offenses in this case occurred. Once at Marchenell, the defendant ordered the victim not to "mingle" with or get to know the other tenants because he did not want anyone knowing his "business." The victim described several instances in which the defendant abused her at the boarding house. On one occasion, he

2

forced the victim to sit in a chair in the doorway of the rooming house wearing only her adult diaper for the rest of the tenants to see. On a separate occasion, when the victim was in the kitchen with a tenant named Judy Thomas, the defendant pushed the victim against a wall, nearly knocking her to the ground. When Ms. Thomas remarked that the defendant nearly knocked the victim down, the defendant replied, "[T]his my b***h, I can do whatever I want to with that wh*re, don't nobody run her but me." The victim explained that if she ever attempted to say "no" to the defendant, he would tell her that "no mean on your a** I go."

The victim testified that the defendant was continuously under the influence of crack cocaine and was using crack cocaine on the date of the offenses. She recalled that the defendant would hardly sleep but "was just up, just getting high." Whenever the victim would attempt to sleep, the defendant would hit her to wake her up. He would tell the victim that he could not sleep because he was "paranoid." Despite the defendant's mistreatment of her, the victim did not leave him because she had no family to rely on to help her with her medical needs.

On the evening of March 11, 2011, the victim asked the defendant to massage her feet. While the defendant was out of the room, she removed her shoes and socks and discovered some remaining money from her disability check in her sock. She held the money in her right hand during the massage. At the end of the massage, the defendant asked the victim what was in her hand. When she told him, the defendant took the money, bending a finger back on the victim's hand to cause her to release her grip on the money. The victim then sat down on her bed, and her left leg began to shake. The defendant ordered her to stop her leg from shaking, and the victim explained that the stroke caused the shaking and that she could not stop it. The defendant kicked her "real hard" on her left leg, saying, "Bet I stop that motherf****r." The victim laid down on the bed in an effort to prevent the defendant from hitting her. She told the defendant that her stomach was hurting, and, believing it was due to hunger, she asked the defendant to fix her something to eat. The victim later realized that she was beginning her menstrual cycle.

The defendant left the room and went to cook a frozen pizza. He returned with the hot pizza and hurled it at the victim's left leg, burning it. The defendant told the victim that she would not get anything to eat. He spat on, stepped on, and extinguished cigarettes on the pizza to ensure that the victim could not eat it. The victim eventually "dozed off," and the defendant remained in the room "doing his thing." She testified that the defendant was using crack cocaine that day. Whenever the defendant noticed that the victim was asleep, he would hit the victim to wake her.

3

Both the victim and the defendant eventually fell asleep, but the defendant later awoke around 2 or 3 a.m. He asked the victim if he could "have some," which the victim testified meant sexual intercourse. The victim replied that she did not want to have sex with the defendant because she was on her menstrual cycle. The defendant then pulled out a knife and cut the victim on the right side of her head. The victim explained that it was a small cut underneath her hair. The victim felt blood from the wound, and the defendant told her, "[N]ow you see how easy it is for me to kill your motherf*****g a**." The defendant held the knife to the victim's throat and began to rip off her clothes. The victim testified that the defendant did not bruise or scratch her when he tore off her clothes. The victim begged for him to stop, and she looked into his eyes and "saw nothing but red."

The defendant forced the victim's legs into the air and threatened to break her left leg if she said anything. He placed hair grease inside the victim's vagina and proceeded to penetrate her vagina with his penis. The defendant was not wearing a condom, and he ejaculated inside of the victim. The victim testified that the defendant also made her perform oral sex.

After the sexual assault, the victim said that she needed to use the restroom, but the defendant would not let her leave the room. She urinated in the bed, and the defendant shoved her onto the floor. The defendant ordered her not to leave the room, and the victim testified that he had barricaded the door with a dresser. He told the victim that he would know if she ever left the room because he had constructed a trap that would cause a knife to strike the victim in the face if she attempted to open the door. Although the victim never saw the knife, she was frightened by the defendant's threat because she "didn't know what he was capable of." The victim attempted once to leave the room, and the defendant "drew his hand back" and instructed her not to move the dresser. The victim lay down and went to sleep, and she believed that the defendant did as well. The victim did not know for certain if the defendant was asleep, as she suspected he may have been feigning sleep to see if she would attempt to sneak out of the room.

The next morning, Ms. Thomas knocked on the door and asked if the victim wanted to go outside and enjoy the weather. The defendant informed Ms. Thomas that the victim would not be leaving the room and that she was asleep. He also prevented the victim from answering Ms. Thomas. Ms. Thomas said that she was going to get "the rent man," William Bibbs, to come remove the victim from the room. The victim stated that Ms. Thomas called Mr. Bibbs and that Mr. Bibbs and his wife came to the boarding house. They knocked on the door and said that Mrs. Bibbs wanted to meet the victim. The victim and the defendant got dressed and opened the door. Eventually, the defendant left the room to go to the store. The victim testified that Ms. Thomas and Mr. Bibb were able to get her out of the room once the defendant left and that it was the first time that

4

she had been able to leave the room since the rape. Ms. Thomas went to get the victim some food, and the victim then went into Ms. Thomas's room and called police. After calling police, she went outside and was sitting on the porch when the defendant returned from the store. Later that evening, police arrived at the house and took the victim's statement. In her statement, the victim told police that the defendant forced her to have oral and vaginal sex with him. She also told police that the defendant went to sleep immediately after raping her and that he had locked her in the room from the outside. The defendant was taken into custody at the scene.

After police arrested the defendant, the victim went to the rape crisis center, where forensic nurse examiner Tammy Keough conducted a sexual assault examination. Ms. Keough observed blood in the victim's vaginal canal and "white secretions on her inner thighs," which Ms. Keough tested for DNA. The victim had a bruise on the inside of her left leg and "some abrasions" on her left thigh and right inner wrist. The abrasions appeared to be "over several hours old." Ms. Keough testified that she noted in her patient report that the victim reported an incident the week before in which hot pizza was thrown on her leg and a cigarette was extinguished on her right wrist. Ms. Keough stated that the abrasions on the victim's left thigh were consistent with her statement that the defendant hurled hot pizza at her leg and that the injury on the victim's wrist was consistent with that of a cigarette burn. Ms. Keough explained that because not every injury healed the same way, some abrasions could begin to heal properly within twenty-four hours while others could take up to a week or longer to heal. Ms. Keough took DNA swabs from the inside of the victim's cheek, the outside and interior of her vagina, and both inner thighs. She testified that it was more difficult to recover evidence of a sexual assault when a person was on their menstrual cycle. She did not notice any hair grease on the victim's vagina. She agreed that her report said that the defendant went to sleep after the sexual encounter.

Lawrence James, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified as an expert in forensic DNA analysis. He found semen on the vaginal and left inner thigh swabs. Agent James testified that the DNA profile from the vaginal swabs was consistent with a mix between the victim and the defendant's DNA. He stated that tests of the left inner thigh swabs returned a partial DNA profile that was consistent with a mix between the DNA of the victim and the defendant. He testified that the odds were very remote that a person other than the defendant or the victim contributed DNA to the profile. He explained that DNA results did not indicate whether a sexual encounter was consensual.

On cross-examination, the victim disagreed that she and the defendant "were both very mean to each other." She testified that a key was necessary to unlock the bedroom door from the inside. The victim was later called as a witness by the defense, and she

testified that she knew that she could unlock the bedroom door without a key. The victim agreed that she told police that the defendant went to sleep immediately after raping her. She testified that Andrew Harris, Ms. Thomas's boyfriend, came into her room after the defendant raped her. Mr. Harris asked the victim if she was okay, and she replied that she was not and that the defendant had been hitting her and had stolen her money. The defendant denied these accusations, and Mr. Harris told them to keep the noise level down in the room and for the defendant not to do "that" to her. The victim later testified that Mr. Harris came into the bedroom before the rape occurred.

Judy Thomas testified that she had lived in the same boarding house as the victim and the defendant. She described their relationship as "odd" because the two would often "talk bad to each other" and it was unclear whether their tones were playful or serious. She stated that they had their "ups and downs" and that the victim "said nasty things to [the defendant] and he said nasty things to her." She testified that the defendant did not seem intimidated by the victim but that the victim seemed intimidated by the defendant. Ms. Thomas testified that the victim told her that the defendant would hit the victim and tell her that she could not leave the bedroom. Ms. Thomas once overheard the defendant tell the victim, "[W]ho you think would want you? Look at you. You don't look like nothing." She also heard the defendant tell the victim that he could rape her, no one would know about it, and the victim could not prove it. She was unsure whether this comment was made in jest. Ms. Thomas recalled the incidents when the defendant forced the victim to sit in a chair wearing only her diaper and when the defendant shoved the victim in the kitchen.

On the early morning of March 12, 2011, Ms. Thomas was in her room with Mr. Harris. Around 2 or 3 a.m., she heard screams coming from the victim's room and thought that she heard the victim shout her name. Ms. Thomas asked Mr. Harris to investigate the noise, and she watched from the end of the hallway. She saw Mr. Harris enter the room, but she could not hear most of the conversation. When Mr. Harris returned, she asked if the victim was "okay," and Mr. Harris responded affirmatively.

Ms. Thomas next saw the victim when Mr. and Mrs. Bibbs came to the boarding house the following day. Ms. Thomas testified that she did not initially call Mr. and Mrs. Bibbs and ask them to come to the house. The Bibbs knocked on the door and asked the victim and defendant to open the door so that Mrs. Bibbs could meet the victim. Ms. Thomas testified that she was also at the door and "had to beat on the door" to convince the defendant to open it. The defendant initially said that the victim was sleeping, but the victim emerged once the defendant "finally" opened the door. Ms. Thomas testified that it took "a while" for the defendant to open the door. The victim did not "look right" and did not appear to have been sleeping when she exited the room. Ms. Thomas observed

that the victim had her clothes on and seemed to have been simply "laying in the bed." Ms. Thomas testified that it "[l]ooked like something had happened."

Ms. Thomas testified that the defendant proceeded to go out onto the porch and that Mr. and Mrs. Bibbs left the house. While the defendant was on the porch, the victim told Ms. Thomas that the defendant had raped her. The two women went into Ms. Thomas's room, and Ms. Thomas called Mr. Bibbs, who instructed her to call the police. Ms. Thomas testified that Mr. Bibbs called the police and that the victim remained in her room. The defendant attempted to speak with the victim several times while she was in Ms. Thomas's room. Ms. Thomas noticed that the victim "would jump" every time that the defendant entered the room. Mr. and Mrs. Bibbs returned to the house, and Mr. Bibbs took Ms. Thomas to get the victim something to eat. Ms. Thomas testified that it took "a while" for the police to arrive at the house.

On cross-examination, Ms. Thomas testified that it was not possible to lock someone into the victim's room from the inside because the person inside of the room could unlock the door without a key. She testified that it would not have been truthful if someone testified that the victim was "always nice" to the defendant. She testified that to her knowledge, the victim was a truthful person. She also testified that she, and not the victim, called the police. She agreed that she told an investigator that no one in the house was afraid of the defendant and that the two did not have a history of physical violence. She testified that the defendant bathed, dressed, and changed the victim. She stated that the victim told her that she could not go out of the room because the defendant had placed a trap on the door and would have known if she left the room. She stated that she had never seen a trap anywhere on the bedroom door.

Andrew Harris testified that he also lived at the boarding house with the victim and the defendant. He heard the victim and the defendant speak derogatorily toward one another, and he said that the defendant would often degrade the victim. Mr. Harris could not tell whether the remarks were of a serious nature because they regularly addressed each other in this manner. He stated that "at times they were laughing and at times they would show no expression at all." He never saw the conversations lead to "physical results." Mr. Harris testified that he thought that "[a]t some point" the victim was afraid of the defendant.

Mr. Harris testified that on the evening of the incident, he was in his room with Ms. Thomas. At some point during "the wee hours of the night," he heard shouting coming from the victim's room. He believed that this occurred between the hours of 11:00 p.m. and 1:00 a.m. He heard someone shouting for help and shouting Ms. Thomas's name. He testified that he had not previously heard the victim shouting for help. Ms. Thomas told Mr. Harris to investigate the sounds, and he went across the hall

7

and knocked on the victim's door. He asked for the victim by name, and the defendant responded. Mr. Harris asked where the victim was, and the defendant told him that everything was all right. Mr. Harris said that he wanted to speak with the victim, and the defendant "got quiet." Mr. Harris knew that the defendant could "become violent," and he went and put on his tennis shoes in order to be prepared "if it came to that -- that stage." He returned and knocked on the door more forcefully, insisting that he speak with the victim.

The defendant "finally" opened the door, and Mr. Harris stepped into the room. Mr. Harris saw the victim sitting on the bed, and he noticed that her shirt had been ripped. He saw two scars on the victim's "breast area" that she was attempting to cover up. Mr. Harris asked the victim if she was okay, and the victim did not respond. Mr. Harris could see that the victim had been crying, and he asked her several more times if she was okay. The victim "dropped her head somewhat" and replied in a "low" voice that she was okay. Mr. Harris asked her a final time if she was okay, and the victim said "with a little more authority" that she was. Throughout this exchange, the defendant did not say anything to Mr. Harris or attempt to prevent the victim from speaking.

Mr. Harris returned to his room, but he was still "kind of concerned." He told Ms. Thomas that everything "appeared to be" okay, and the two went to sleep. Mr. Harris did not hear any more noise coming from the victim's room the rest of the evening.

On cross-examination, Mr. Harris testified that the victim began dating again "three to four days" after the incident. Mr. Harris stated that the victim was not a truthful person. He testified that a key was not required to unlock the victim's bedroom door from the inside. He said that he did not see a wound on the victim's head. He agreed that the defendant was the victim's primary caretaker.

Officer Edward Cash of the Memphis Police Department ("MPD") testified that he responded to the 9-1-1 call from the rooming house. He arrived around 7:00 p.m. on the evening of March 12, and upon his arrival he learned that Ms. Thomas called police on behalf of the victim. Officer Cash spoke with the victim, who told him "that she had been held captive in a room" with the defendant "for at least a couple of days." She told him that around 3 a.m. the defendant "asked for sex" and that she rebuffed him because she was on her menstrual cycle at the time. The victim told Officer Cash that the defendant proceeded to have sexual intercourse with her despite her initial refusal. The victim said that the defendant was under the influence of crack cocaine at the time. She also told Officer Cash that she "yelled out" during the intercourse and shouted Ms. Thomas's name. She stated that a man knocked on their door and asked if everything was "okay." The victim said "yes," but the defendant said "no." Officer Cash described the victim's demeanor during the conversation as "dejected." Officer Cash also spoke

8

with Mr. Harris, who confirmed that he went to check on the victim in the early morning hours. Officer Cash and his partner took the defendant into custody at the scene.

The defense called the victim as a witness. She testified that she was friends with Tonya Grayer and lived with Ms. Grayer in 2009. She testified that she and her daughter did not plan to have the defendant arrested for kidnapping. She recalled an incident when she was sitting on Ms. Grayer's porch and the defendant came to the house. He told her to come with him, and she declined. He "snatched" her out of her wheelchair and forced her into his mother's vehicle, which his mother was driving. The defendant instructed his mother to drive away, and she did so. The victim stated that the police were called due to the defendant's actions. She testified that she was kidnapped by the defendant but that she chose not to press charges. The victim denied planning with her daughter in Ms. Grayer's driveway to have the defendant arrested for kidnapping charges. She testified that she never made a false allegation that the defendant hit her at the home of his sister, Thea Horne. She stated that she realized that she could unlock her bedroom door from the inside, but she said that she could not leave the room because she was too afraid of the defendant.

William Bibbs testified that the lock on the door to the victim's room did not require a key to be opened from the inside. He testified that on the day that the defendant was arrested, he saw the defendant for the first time in a police car. He stated that he did not see the defendant in his room or on the porch.

Thea Horne testified that she once heard the victim make a false allegation against the defendant. The victim and defendant were attending a dinner party at Ms. Horne's home, and Ms. Horne heard the victim shout from a separate room that the defendant was hitting her. Ms. Horne, "alarmed by the allegation," went into the room and "immediately got in [the defendant's] face." Ms. Horne testified that the defendant was "smirking a little bit," and she said, "[W]hat do you mean, you hitting a woman, I know you been raised better than that, what is going on?" The defendant told Ms. Horne that the victim "started it," and he denied hitting the victim. He claimed that she was "just trying to get [him] in trouble." Ms. Horne asked the victim if that was true, and the victim "just burst out laughing." Ms. Horne testified that the defendant attended to "[a]ll" of the victim's special needs. She testified that it would not change her opinion on how the defendant was raised to learn that he had a conviction for domestic assault in an unrelated case in which the victim was the mother of one of his children. She testified that the defendant "was raised properly" but that as a person aged, their behavior was "an individual choice."

9

Lovella Shaw testified that she "did not act as the getaway driver" in a kidnapping of the victim. She explained that the victim got into her vehicle and went with her and the defendant to her home.

Tonya Grayer testified that she was friends with the victim and that the victim lived with her in 2009. The victim's daughter also lived with Ms. Grayer. Ms. Grayer recalled an incident where the defendant came to her house, picked the victim up off of the living room couch, placed her in her wheelchair, and wheeled her out of the house. He placed the victim in a vehicle, and they drove away. The victim's daughter then called police, and police placed the defendant in the back of a police car. Ms. Grayer testified that the victim told police that the defendant had kidnapped her. She testified that she previously told the trial court that the victim told police that she was not kidnapped. When asked how both of those things could be true, Ms. Grayer responded, "One of them is true."

At the conclusion of the proof, the jury convicted the defendant of the lesser included offense of rape, two counts of the lesser included offense of false imprisonment, and domestic assault as charged. The trial court merged the two convictions for false imprisonment. The trial court imposed a ten-year sentence for the rape conviction and sentences of eleven months and twenty-nine days for the false imprisonment and domestic assault convictions. The trial court ordered the sentences to be served concurrently for an effective sentence of ten years.

The defendant filed a motion for new trial, which the trial court denied. The defendant filed a timely notice of appeal, and we proceed to consider his claims.

**ANALYSIS**

On appeal, the defendant raises ten issues. He argues that the trial court erred by not requiring the State to make an election of offenses; that the evidence is insufficient to sustain his convictions; that Ms. Horne's testimony did not open the door to his prior conviction for domestic assault; that the trial court erred in restricting the testimony of Ms. Grayer to impeach the victim; that the trial court erred by instructing the jury regarding the *mens rea* of recklessness for the crime of rape; that the trial court should have instructed the jury regarding the defense of voluntary intoxication; that the trial court erred in admitting evidence of his prior bad acts; that the State committed prosecutorial misconduct in its opening statement; that it was plain error to allow the victim to testify that the defendant was incarcerated; and that his convictions should be reversed under the doctrine of cumulative error.

# I. Election of Offenses

The defendant contends that the trial court failed in requiring the State to make an election of offenses for the rape and domestic assault convictions. He argues that there was evidence of multiple offenses for each of the charged offenses, that the State did not make an effective election with its closing argument, and that closing argument can never serve as an effective election. The State responds that there was an effective election in closing arguments for the offense of rape but concedes that there was no election for the offense of domestic assault and that the defendant is entitled to a new trial on that charge.

The doctrine of election requires the State to elect a set of facts when it charges a defendant with one offense, but there is evidence of multiple offenses. *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). This doctrine is applied to ensure that the defendant can prepare for the specific charge, to protect the defendant from double jeopardy, and to allow an appellate court to review the legal sufficiency of the evidence. *Id.* Most importantly, election ensures that some jurors do not convict the defendant of one offense and other jurors of another. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). It is the duty of the trial court to require the State to make an election of offenses at the close of its case-in-chief regardless of whether the defendant requested the instruction. *State v. Kendrick*, 38 S.W.3d 566, 569 (Tenn. 2001); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973).

## A. Rape

The defendant argues that an election was required because the victim testified about both vaginal intercourse and oral sex. The defendant also contends that the State's closing argument was insufficient to serve as an election because trial counsel's closing argument fairly raised the issue of oral penetration and that closing argument can never serve as an effective election.

The indictment charged the defendant with one count of aggravated rape. At trial, the victim testified that the defendant had vaginal intercourse with her and also that he forced her to perform oral sex. Rape is defined as the "unlawful penetration of a victim by the defendant," which may be accomplished by "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." T.C.A. §39-13-503(a)(1); T.C.A. §39-13-501(7) (2010). Thus, vaginal intercourse and fellatio are both manners in which the offense of rape may be committed. Because the victim testified to instances of vaginal intercourse and fellatio and the defendant was charged with only one offense, an election of offenses was

11

necessary. *Brown*, 992 S.W.2d at 391. Therefore, the trial court erred when it did not require the State to make an election of offenses.

The error in failing to require an election of offenses may be harmless when the State makes an effective election of offenses through closing argument. *See, e.g., State v. Busby*, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *6 (Tenn. Crim. App. Mar. 29, 2005). As our supreme court observed in a recent opinion, panels of this court "have held that a failure to instruct the jury properly about the State's election of offenses may be cured by a prosecutor's closing argument if it provides an effective substitute for the missing instructions." *State v. Courtney Knowles*, 470 S.W.3d 416, 427 (Tenn. 2015) (collecting cases). Here, the State focused both its closing and rebuttal closing arguments solely on the instance of vaginal intercourse. The arguments made it clear that the State intended for the jury to consider the vaginal intercourse as the offense of rape. The defendant's reference to oral sex in closing arguments did not serve to negate the State's effective election and to place the issue of oral penetration before the jury. Therefore, we conclude that the error in failing to require an election of offenses was harmless, and the defendant is not entitled to any relief.

### B. Domestic Assault

The defendant argues that the State was required to make an election in regards to the offense of domestic assault. He contends that the State failed to make an election in its closing argument. The State concedes that an election was required and that there was not a sufficient election in closing argument to cure this error.

The proof at trial included numerous events that could have constituted domestic assault that occurred on the date of the incident. The victim testified that the defendant kicked her left leg, threw hot pizza on her leg, cut her on the head, and hit her when she would fall asleep. Mr. Harris testified that he saw two scratches on the victim's chest, and Ms. Keough testified that the defendant had abrasions on her right wrist consistent with a cigarette burn and abrasions on her inner thigh consistent with having hot pizza thrown on her. Assault is not a continuing offense but "is consummated or completed the moment bodily injury occurs." *State v. Legg*, 9 S.W.3d 111, 118 (Tenn. 1999). Thus, the State elicited testimony describing multiple potential assaults against the victim. As a result, the trial court should have required the State to make an election of offenses.

While the State concedes that the defendant's conviction for domestic assault must be reversed and remanded for a new trial, the State's concession is not binding on this court. *See Barron v. State, Dept. of Human Services*, 184 S.W.3d 219, 223 (Tenn. 2006). The State referenced four injuries in its closing and rebuttal closing arguments: the bruise on the victim's inner thigh, the burn on her leg, the cigarette burn on her wrist,

and the cut on her forehead. When discussing the bruise, the State argued that it occurred when the defendant lifted the victim's leg to sexually penetrate her, indicating that the bruise was the "bodily injury" that made the rape aggravated. Of the three remaining injuries, the State devoted the most discussion and reference to the pizza incident that resulted in the burn on the victim's leg. It was the only injury that the State described in specific detail, and it was the only injury that the State identified as occurring before the rape, distinguishing it from the other injuries. The State repeatedly directed the jury's attention to the burn and made only fleeting references to the cigarette burn and the cut on the victim's forehead. We conclude that the State made a sufficient election in closing argument, rendering the error harmless.

## II. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to sustain his convictions. He contends that no rational juror could have believed the testimony of the victim because her testimony was inconsistent and because she was an untruthful person.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "[A]lthough inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the

circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Tennessee Code Annotated section 39-13-503(a)(1) (2010) defines rape as the "unlawful penetration of a victim by the defendant" accompanied, as charged here, by force or coercion. False imprisonment is the knowing removal or confinement of "another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a). Domestic assault occurs when a person intentionally, knowingly, or recklessly causes bodily injury to a domestic abuse victim. T.C.A. § 39-13-111(b); T.C.A. § 39-13-101(a)(1). A domestic abuse victim includes "[a]dults . . . who live together or who have lived together" and "[a]dults . . . who are dating or who have dated or who have or had a sexual relationship." T.C.A. § 39-13-111(a)(2), (3).

Viewing the evidence in the light most favorable to the State, the victim and the defendant were in a romantic relationship and were living together at the time of the crimes. The victim testified that the defendant threw hot pizza on her leg, burning her, and Ms. Keough testified that there were abrasions on the victim's left thigh that were consistent with her statement that hot pizza was thrown on her leg. In the early morning hours after the pizza incident, the defendant asked the victim to have sex with him. When the victim refused, the defendant tore off her clothing and forced her legs into the air, threatening to break her left leg. He then penetrated her vagina with his penis. DNA testing of swabs taken from the victim's vagina and inner thigh revealed a combined DNA profile of the victim and the defendant. Ms. Thomas and Mr. Harris heard shouting coming from the victim's room in the early morning of March 12, and Mr. Thomas noticed that the victim's shirt was ripped when he went into her room. The victim testified that the defendant told her not to leave the room after the rape, that he raised his hand in a threatening manner when she tried to leave, and that she was too afraid of the defendant to attempt to leave again. She testified that she was only able to leave the room after Ms. Thomas and Mr. Bibbs convinced the defendant to open the door to the room. The jury heard the inconsistencies in the victim's testimony and that Mr. Harris considered her to be an untruthful person. The jury resolved the question of her credibility against the defendant, and we will not re-weigh her credibility on appeal. We conclude that the evidence was sufficient to support the defendant's convictions for rape, false imprisonment, and domestic assault. The defendant is not entitled to relief as to this issue.

### III. Prior Convictions

The defendant argues that Ms. Horne's testimony did not "open the door" to allow the State to question her about his prior conviction for domestic assault. He contends that

her statement was not an assertion of his good character and that the prejudicial nature of the conviction did not render the error harmless.

At trial, Ms. Horne responded affirmatively when asked, "Have you ever seen [the victim] make a false allegation against [the defendant]?" Ms. Horne described an incident that occurred in her home when she heard the victim shouting, "Thea, Thea, Thea, [the defendant] is hitting me." Ms. Horne stated that when she heard the allegation, she confronted the defendant and said, "[W]hat do you mean, you hitting a woman, I know you been raised better than that, what is going on[?]" The State argued that this statement placed the defendant's character at issue and opened the door to impeach Ms. Horne with the defendant's prior convictions, which included convictions for sexual battery, voluntary manslaughter, and domestic assault.

In a jury-out hearing, the trial court stated that Ms. Horne could have testified in a manner "that would have excluded" any statements indicating that the defendant "kn[e]w better than" to hit a woman or was "raised better than" to hit a woman. The court observed that "a bell has been rung now" by Ms. Horne's statement and that her testimony put "an issue out there that wasn't necessary to put out there." The court found that the probative value of the defendant's conviction for sexual battery was outweighed by the danger of unfair prejudice and that his voluntary manslaughter conviction was not relevant to illustrating the defendant's behavior toward women. The State indicated that the defendant was convicted of domestic assault in 2003 and provided the police report number and disposition case. Relying on this information, the court implicitly found that there was a factual basis for the inquiry into the defendant's past conduct. The court also found that the defendant's prior conviction for domestic assault "goes directly to the heart of the question that [Ms. Horne] put forth in front of the jury." The court ruled that it would permit the State to ask Ms. Horne if the prior conviction for domestic assault would change her opinion "that [the defendant] was raised not to hit a woman." The trial court issued a limiting instruction immediately after the cross-examination of Ms. Horne that the jury was not to use her testimony about the defendant's prior conviction as evidence of his guilt or innocence for the crimes with which he was charged. The court reissued this limiting instruction during its final instructions to the jury after the close of the proof.

A trial court's decision to admit evidence will not be reversed absent a showing that the trial court abused its discretion. *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000). A trial court has abused its discretion only when it has "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the complaining party." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

15

Ordinarily, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, if the defendant introduces evidence of his good character, the State may introduce evidence to the contrary. Tenn. R. Evid. 404(a)(1). If a character witness for the defendant offers opinion testimony regarding a character trait of the defendant, the State may be permitted to inquire into specific instances of conduct on cross-examination. Tenn. R. Evid. 405(a). The trial court must hold a jury-out hearing, "determine that a reasonable factual basis exists for the inquiry," and determine that the probative value of the evidence outweighs the prejudicial effect. Tenn. R. Evid. 405(a)(1)-(3).

Evidence that is ordinarily inadmissible at trial may become admissible if a party "opens the door" to its admission. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). "A party opens the door to evidence when that party 'introduces evidence or takes some action that makes admissible evidence that would have previously been inadmissible.'" *Id.* (quoting 21 Charles Alan Wright et al., *Federal Practice and Procedure Evidence* § 5039 (2d ed.1987)). Opening the door most commonly occurs when a party raises "the subject of that evidence at trial." *Id.* Thus, by proffering testimony about the defendant's character, the defendant may open the door for the State to inquire about prior convictions that would have otherwise been inadmissible.

Ms. Horne testified that the victim made a false allegation of domestic assault against the defendant. Ms. Horne's testimony conveyed to the jury that the defendant would not hit a woman because he was "raised better than that." Her testimony placed the defendant's good character at issue, opening the door for the State to cross-examine her about the defendant's prior conviction. The trial court complied with the procedures of Rule 405(a) and gave the jury a limiting instruction regarding the use of the prior conviction. We conclude that the trial court did not abuse its discretion in admitting the evidence, and the defendant is not entitled to any relief.

## IV. Impeachment Testimony

The defendant argues that the trial court erred by preventing him from questioning Ms. Grayer about the victim's plot to falsely accuse the defendant of kidnapping. Specifically, he contends that he should have been permitted to question Ms. Grayer pursuant to Tennessee Rule of Evidence 613. In the alternative, he posits that her testimony was admissible under the excited utterance exception to the rule against hearsay or pursuant to his constitutional right to present a defense.

On direct examination, trial counsel asked the victim, "Did you and your daughter plan to have [the defendant] arrested for kidnapping?" The victim responded that she did

16

not.  She testified that she was sitting on the porch of Ms. Grayer's home when the defendant arrived and told the victim to come with him.  The victim said, "[N]o," and the defendant grabbed her and attempted to force her into her wheelchair.  He then forced the victim into a car driven by Ms. Shaw and instructed Ms. Shaw to drive away from the house.  The victim testified that police were called because of the way the defendant removed her from the porch, and she said that she was kidnapped by the defendant.  She stated that she could have "put a kidnapping charge on him" if she wanted to, but she explained that she did not wish to do so.  Trial counsel later asked, "Do you deny planning to have [the defendant] arrested for kidnapping with your daughter in Miss Grayer's driveway?"  The victim answered that she "did not say" she was going to have the defendant arrested.

The defendant next called Ms. Grayer to testify about the kidnapping incident.  During a jury-out hearing, trial counsel asked, "Miss Grayer, did you observe [the victim] plan the kidnapping ---," at which point the State made an objection to leading that was sustained.  Ms. Grayer then testified that she observed the victim and the victim's daughter having conversations about the defendant.  The victim's daughter told Ms. Grayer that she and the defendant got into an argument, and she told Ms. Grayer that she and the victim were "going to do something to get [the defendant] set up to where he could do time for the rest of his life."  Ms. Grayer told the victim's daughter that they should not do that because it was "the wrong thing to do."  Ms. Grayer testified that this conversation occurred on the same day as the alleged kidnapping.

Ms. Grayer testified that the defendant came to her home, picked the victim up from the couch, and placed her in her wheelchair.  The defendant removed the victim from Ms. Grayer's home, and the victim got into a car with the defendant.  The victim's daughter then called the police and told them that the victim had been kidnapped.  Ms. Grayer testified that she told the victim's daughter that the defendant did not kidnap the victim but that the victim left with him voluntarily.  When police arrived, the victim's daughter again told police that the victim had been kidnapped, and Ms. Grayer told her that the victim voluntarily left with the defendant.  Ms. Grayer stated that the victim told police that she was not kidnapped, and she asserted that the victim's daughter was the only person who told police that the victim was kidnapped.

Ms. Grayer was again asked about the conversation between the victim and her daughter about setting the victim up.  She stated that both women were planning together to have the defendant "locked up and put away for the rest of his life."  Ms. Grayer explained that she told the women "not to do that."  When questioned by the trial court, Ms. Grayer testified that this conversation occurred after the kidnapping incident.  However, when asked a third time about this conversation, she stated that it occurred on the day of the kidnapping incident.  Ms. Grayer again reiterated that the victim told police

17

that she was not kidnapped and that the victim's daughter was the only one to tell police that the incident was a kidnapping.

At the conclusion of Ms. Grayer's testimony, the trial court found that the only person who accused the defendant of kidnapping the victim was the victim's daughter. The court found that both the victim and Ms. Grayer had asserted that the defendant did not kidnap the victim. The trial court found that both the victim and Ms. Grayer testified that the victim did not plot at Ms. Grayer's house to have the defendant charged with kidnapping and that only the victim's daughter plotted to have the defendant charged with kidnapping. Citing to the fact that the victim told police that she was not kidnapped, the court stated that it was "not a plot to put [the defendant] away for the rest of his life by saying he didn't do anything." The trial court found that Ms. Grayer was not entirely sure about whether the conversation between the victim and the victim's daughter occurred before or after the kidnapping incident. The court noted that there was "some question about some conversation between [the victim] and her daughter saying, we'll set [the defendant] up where he'll spend the rest of his life in jail." The court observed that the victim was only asked whether she planned, in front of Ms. Grayer, to have the defendant charged with kidnapping. The court stated:

> So, at th[is] point, now, you're asking me to allow hearsay testimony in to impeach [the victim] who was not given the opportunity to answer that question. That question wasn't put to her.
>
> The specific question that was put to her was, in fact, did you plot to have [the defendant] charged with kidnapping at Miss Grayer's house. And that [Ms. Shaw] was the getaway driver. And I allowed all that in to have all this joined up, and now, the answer is no, [the victim] didn't do it. Her daughter may have done it, but she didn't do it.

The trial court ruled that trial counsel could not question Ms. Grayer about any alleged plot between the victim and her daughter to set up the victim. When Ms. Grayer resumed testifying in front of the jury, she testified that the victim told police that the defendant had kidnapped her. The trial court sent the jury out and advised Ms. Grayer that she should consult an attorney because she could be charged with perjury. The trial court asked Ms. Grayer if she had not just testified under oath that the victim said she was not kidnapped, and Ms. Grayer agreed that she had. When the jury returned, the prosecutor asked Ms. Grayer the same question, and she responded affirmatively. On redirect examination, trial counsel asked how both of Ms. Grayer's conflicting statements could be true, and Ms. Grayer responded, "One of them is true."

18

The defendant argues that Ms. Grayer's testimony was admissible as a prior inconsistent statement to impeach the victim. In the alternative, he posits that the testimony was admissible either as a state of mind exception to the rule against hearsay or pursuant to his right to present a defense. We address each of these arguments in turn.

The trial court possesses the sound discretion to determine whether to admit or exclude evidence. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). The evidentiary ruling of the trial court will not be disturbed on appeal unless the trial court abused its discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court has abused its discretion only when it has "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the complaining party." *Banks*, 271 S.W.3d at 116.

## A. Rule 613

Tennessee Rule of Evidence 613 governs the impeachment of a witness with extrinsic evidence of a prior inconsistent statement. "Extrinsic evidence of a prior inconsistent statement of a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b). Before extrinsic evidence of a prior inconsistent statement is admissible, a witness's attention must "be drawn to the place, persons present, time of the statement, and to the substance of the statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998).

The defendant contends that he should have been permitted "to ask Ms. Grayer, in front of the jury, whether the victim plotted, in Ms. Grayer's driveway, to set Defendant up to do time." The testimony of Ms. Grayer, however, did not establish an inconsistent statement for the purposes of impeaching the victim. The trial court found that the testimony indicated that the victim did not plan to set the defendant up to be arrested for kidnapping. The court also found that if there was a plot to set up the defendant, it was attributable solely to the victim's daughter. Although Ms. Grayer testified about a conversation between the victim and the victim's daughter about setting the defendant up to spend the rest of his life in jail, Ms. Grayer was not clear about when this conversation may have occurred. The only consistent part of Ms. Grayer's jury-out testimony was that the victim told police that she was not kidnapped. We conclude that the trial court did not abuse its discretion in excluding Ms. Grayer's proposed testimony, and the defendant is not entitled to any relief.

## B. Exception to the Rule Against Hearsay

The defendant next argues that Ms. Grayer's testimony should have been admitted pursuant to Tennessee Rule of Evidence 803(3) under the state of mind exception to the rule against hearsay. He acknowledges that this argument was not raised at trial, and he asks the court to review the issue for plain error.

This court considers five factors in determining whether plain error exists:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The existence of all five factors must be established to warrant plain error review. *Smith*, 24 S.W.3d at 283. If this court finds that one of the factors cannot be established, consideration of the remaining factors on appeal is unnecessary. *Id.* An error must be "of such great magnitude" that it probably affected the outcome of the trial. *Id.* (quoting *Adkisson*, 899 S.W.2d at 642). Only errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," will rise to the level of plain error. *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). This court has stated that "rarely will plain error review extend to an evidentiary issue." *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007).

Tennessee Rule of Evidence 803(3) provides for the "state of mind" exception to the rule against hearsay. Under this rule, "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" may be admissible. Tenn. R. Evid. 803(3).

We conclude that consideration of this issue is not necessary to do substantial justice. The defendant contends that had he been permitted to ask Ms. Grayer this question, the jury would have learned that the victim lied under oath and discredited her testimony. Arguably, Ms. Grayer was able to raise this inference to the jury, as she testified that the victim told police that she was kidnapped. Had Ms. Grayer been permitted to testify that she heard the victim plot to set the defendant up for life, however,

any benefit from the testimony could have been undercut by Ms. Grayer's questionable credibility. Her testimony was inconsistent and contradictory. Ms. Grayer agreed that she had moments before told the trial court that the victim said that she was not kidnapped. She did not reveal which version of events was correct, stating only that "[o]ne of them is true." We conclude that the trial court did not commit plain error by limiting the scope of her direct examination.

### C. Right to Present a Defense

The defendant argues that the trial court denied him his right to present a defense by excluding the testimony of Ms. Grayer. He again acknowledges that this argument was not raised in the trial court and requests this court to review the issue for plain error.

"Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). The right to present testimony is not absolute, and the defendant "'must comply with established rules of procedure and evidence. . . .'" *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Id.* at 316. In order to determine whether the exclusion of evidence violated a defendant's constitutional right to present a defense, this court "considers whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *State v. Brown*, 29 S.W.3d 427, 434 (Tenn. 2000).

The defendant contends that it was critical for the defense to show that if the victim was plotting in 2009 to have the defendant falsely arrested, it was likely that she was of the same mindset when the defendant's current charges were filed. However, his argument is not supported by the substance of Ms. Grayer's testimony. As we stated above, her repeated assertions in the jury out hearing that the victim told police that she was not kidnapped contradict the testimony that the victim was plotting to set the defendant up. Ms. Grayer's convoluted and contradictory testimony bore little indicia of reliability. Further, the interests supporting the exclusion of the evidence are substantially important. The evidence was inadmissible pursuant to Tennessee Rule of Evidence 613, and it is paramount that a witness be given an opportunity to explain or deny a statement before it is later used for impeachment purposes. As a result, we conclude that plain error review is not warranted, and the defendant is not entitled to any relief.

21

# V. Jury Instructions

The defendant argues that the trial court erred when it included the mental state of "recklessly" in the jury instructions for the offense of rape. The defendant concedes that our supreme court appeared to have resolved this issue in *State v. Clark*, 452 S.W.3d 268 (Tenn. 2014), but he argues that the issue should be re-examined.

A defendant is entitled to "a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "A charge 'is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). Jury instructions present mixed questions of law and fact, which this court reviews de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

In *State v. Clark,* our supreme court addressed the issue of "the mental state necessary to convict a person of rape of a child." *Clark*, 452 S.W.3d at 295. In *Clark*, the jury was instructed that they could find the defendant guilty of rape of a child "only if the State proved beyond a reasonable doubt that he acted either intentionally, knowingly, or recklessly." *Id.* at 296 (internal quotation marks omitted). The trial court used this instruction because the definition of rape of a child does not contain a specific *mens rea*, and Tennessee Code Annotated section 39-11-301(c) provides that when an offense does not indicate a mental state, "intent, knowledge, or recklessness suffices to establish the culpable mental state." *Id*. at 295. Our supreme court concluded that this instruction was appropriate, holding that "recklessness is a sufficiently culpable mental state to support a conviction for rape of a child." *Id.* at 296. The court reasoned that the first element of rape of a child, unlawful sexual penetration, related "both to the nature of the conduct and to the result of the conduct," and the second element, the age of the victim, was "a circumstance surrounding the conduct." *Id.* "The 'reckless' *mens rea* can apply to the circumstances surrounding a defendant's conduct or to the result of the defendant's conduct." *Id.* (citing *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002)). Because the elements of rape of a child relate to both the result of the defendant's conduct and the circumstances surrounding the conduct, "the culpable mental state of recklessness is sufficient to support a conviction for rape of a child." *Id.* (footnote omitted).

Applying *Clark* to the case at bar, we conclude that the trial court properly instructed the jury regarding the offense of rape. Just like the offense of rape of a child, the offense of rape does not specify a requisite mental state. T.C.A. § 39-13-503. The offense of rape contains the same element of "unlawful sexual penetration" as the offense

22

of rape of a child.  If "unlawful sexual penetration" in the context of rape of a child may be sufficiently established by the culpable mental state of recklessness, it follows that the culpable mental state of recklessness is also sufficient to establish this element for the offense of rape.  Accordingly, we conclude that it was not error for the trial court to instruct the jury that it may find the defendant guilty if he acted recklessly in relation to the element of unlawful sexual penetration.  The defendant is not entitled to relief as to this issue.

## VI. Voluntary Intoxication Instruction

The defendant argues that the trial court erred when, without a request from the defendant, it failed to instruct the jury regarding voluntary intoxication.  Specifically, he contends that the proof shows that he was "highly intoxicated" on the evening of the offenses and that the jury would not have convicted him if it were properly instructed.

As stated above, the trial court must "give a complete charge of the law applicable to the facts of a case." *Garrison*, 40 S.W.3d at 432.  While voluntary "intoxication itself is not a defense to prosecution for an offense," it "is admissible in evidence, if it is relevant to negate a culpable mental state."  T.C.A. § 39-11-503(a).  However, mere proof of intoxication does not "entitle an accused to jury instructions . . .; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent." *State v. Hatcher*, 310 S.W.3d 788, 815 (Tenn. 2010) (footnote omitted) (quoting *Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979)).  The inquiry focuses on the defendant's mental capacity at the time of the offense and not whether a defendant was intoxicated. *Id.*

When the defendant does not object to an allegedly incomplete jury charge, this court will review the issue for plain error only. *Hatcher*, 310 S.W.3d at 815 n.15.  However, when the proof shows that a defendant was "highly intoxicated," a voluntary intoxication instruction is appropriate even absent a request. *Brown v. State*, 553 S.W.2d 94, 95-96 (Tenn. Crim. App. 1977).

Here, there is no evidence that the defendant's usage of crack cocaine prevented him from forming the culpable mental state to commit the offenses.  There was evidence that the defendant habitually used crack cocaine and used it the evening of the incident, as the victim testified that the defendant had used crack cocaine, that he had difficulty sleeping, and that his eyes were red.  There was no evidence presented, however, regarding the defendant's level of intoxication at the time of the offenses. *See Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *12 (Tenn. Crim. App. Jan. 11, 2012) (upholding finding of post-conviction court that there was no evidence that the petitioner's intoxication prevented him from forming requisite mental

23

state when proof showed that he had been smoking marijuana prior to the crimes but did not show how intoxicated he was at the time of the crime). Additionally, there was no proof presented that the defendant's use of crack cocaine "deprived him of the mental capacity to form the culpable mental state required for" aggravated rape, aggravated kidnapping, and domestic assault. *Hatcher*, 310 S.W.3d at 815. We conclude that the trial court did not commit error by not providing the jury with an instruction regarding voluntary intoxication.

## VII. Prior Bad Acts

The defendant argues that the trial court abused its discretion in admitting evidence of the defendant's prior bad acts, including previous assaults and threats to the victim. He contends that the acts were not admissible to establish his intent and that the probative value was outweighed by the danger of unfair prejudice. The State responds that the evidence was admissible to demonstrate the nature of the relationship between the victim and the defendant and the defendant's intent to harm the victim.

Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." This rule is one of exclusion, in place to ensure that a jury does not improperly convict a defendant based upon "his or her bad character or apparent propensity or disposition to commit a crime," rather than on the strength of the evidence presented at trial. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). However, such evidence may be admissible for other purposes, which include "issues such as identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404(b) Advisory Comm'n Cmt. Evidence of "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). However, while such evidence may be relevant, there is not "a per se rule" that evidence of prior acts of physical violence by the defendant against the victim is admissible. *State v. Gilley*, 173 S.W.3d 1, 7 (Tenn. 2005). In order to admit evidence of a prior bad act:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

24

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

Ordinarily, this court reviews a trial court's evidentiary ruling regarding 404(b) under an abuse of discretion standard. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). However, if the trial court did not substantially comply with the procedural requirements of 404(b), our standard of review is de novo. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014).

The State attempted to introduce evidence of several prior bad acts of the defendant. At a jury-out hearing, the State argued that the evidence was being offered to demonstrate the defendant's hatred of the victim and his desire to control the victim. The trial court permitted the State to introduce evidence of the following prior bad acts of the defendant: (1) Ms. Thomas observed the victim sitting in a chair wearing nothing but an adult diaper and heard the defendant continually refer to the victim as his b***h; (2) Mr. Harris and Ms. Thomas observed the defendant intentionally shove the victim several days before the incidents in the case at bar, nearly causing her to fall; (3) the defendant's threat to rape the victim's granddaughter if she disclosed the abuse that he inflicted; (4) the defendant poked the victim in the eye during an argument in the winter of 2010; (5) the defendant told Ms. Thomas that no one "was going to tell him how to handle his b***h;" and (6) Ms. Thomas heard the defendant tell the victim that he could rape her and that she would be unable to do anything about it. The trial court did not permit the State to admit testimony that the defendant told the victim that he had previously raped someone and gotten away with it, finding that the probative value was outweighed by the danger of unfair prejudice. The court also excluded testimony of several other acts of physical violence, finding that they were not established by clear and convincing evidence.

In admitting the evidence, the court found that there was a material issue other than conformity with a particular character trait. The court found that consent was "a valid issue in this case" and that evidence of the verbal abuse addressed the nature of the victim's and the defendant's relationship and whether the sexual encounter was consensual. The court also found that the evidence was admissible to prove the defendant's intent. The court determined that the prior acts were proved by clear and convincing evidence. In excluding portions of the State's proposed evidence, the court found that the probative value was outweighed by a danger of unfair prejudice.

25

The record reflects that the trial court substantially complied with the requirements of 404(b) by conducting a jury-out hearing, determining that a material issue other than conformity with a character trait existed, that the proof of the bad acts was clear and convincing, and that the probative value outweighed the danger of unfair prejudice. The evidence demonstrated the defendant's hostility toward the victim and was probative of the nature of their relationship and of his intent on the date of the offenses. We conclude that the trial court properly admitted the evidence, and the defendant is not entitled to any relief.

## VIII. Prosecutorial Misconduct

The defendant argues that the State committed prosecutorial misconduct during its opening statement. He acknowledges that he did not make a contemporaneous objection to these comments, but he contends that the argument rose to the level of reversible plain error.

During voir dire, trial counsel asked potential jurors to evaluate the truthfulness of several well-known aphorisms on a scale from one to ten. Trial counsel first asked about the statement "[m]oney is the root of all evil." One prospective juror gave the statement a "seven," while a second juror assigned the statement a weight of "five." The second juror explained that items other than money, such as "[p]ower," "[p]assion," and "[a]ddiction," could be the source of evil. Trial counsel proceeded to ask the jurors about several other statements, including "Beauty is in the eye of the beholder;" "all's fair in love and war;" and "Hell hath no fury like a woman scorned." In the following excerpts from the State's opening statement, the State referenced trial counsel's line of questioning from voir dire and repeatedly characterized the defendant as "evil":

Yesterday during voir dire [trial counsel] asked you was money the root of all evil. Some of you said yes. Some of you said power was the root of all evil. Some of you said passion was the root of all evil. Yet others said addiction was the root of all evil.

Those things, power, passion, addiction, the root of evil. Evil is sitting here in this courtroom right now.

Evil goes by the name of [the defendant].

[The defendant] is here today because he is accused of aggravated rape. Aggravated kidnapping. And domestic assault.

26

Evil.

. . . .

From 2007 to 2011, [the victim] endured abuse at the hands of evil.

. . . .

He would take care of her, but he would also hurt her.  And during March of 2011, it all came to a head.  Evil reared its ugly head for what we hope is the last time.

. . . .

[The victim] said, no, I'm cramping.  I'm about to start my cycle.  I don't want to have sex with you.  It's nasty.  I don't want to do that.  I don't want to have sex with you on my cycle.

Evil didn't care.

. . . .

Threw hot pizza on her.  Burned her with a cigarette.  Put a knife to her head.

Evil.

. . . .

Evil sits in this courtroom and it goes by the name of [the defendant].

. . . .

You will understand what power is, what addiction is.  You will understand that evil is [the defendant] and when you're done listening to the testimony after we've said all the things that we needed to say, I'll ask that you find [the defendant], the face of evil, find him guilty . . . .

The defendant did not object to any of the State's opening statements.  Prior to closing arguments, there was a bench conference where trial counsel addressed the State's opening remarks.  Trial counsel requested that the State be prohibited from using epithets to refer to the defendant in closing arguments, stating that while he was not aware of any

opinions of this court prohibiting such conduct in opening statements, this court had repeatedly concluded that to do so in closing arguments was improper.

The defendant raised this issue in his motion for new trial, and the trial court found that the State's usage of the word "evil" in opening statements was improper. The court found that the State's remarks were not necessarily made in response to trial counsel's questions in voir dire but were part of a theme of alluding to the defendant as evil. The court deemed the error harmless, finding that the opening statements were not the basis for the defendant's convictions.

The defendant concedes that he did not object to the statements of the prosecutor. He correctly observes that we therefore may only review the issue for plain error.

Both the State and the defendant are entitled to make opening statements at the outset of the trial. T.C.A. § 20-9-301. The purpose of opening statements is "merely to inform the trial judge and the jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012) (quoting *State v. Stout*, 46 S.W.3d 689, 713 (Tenn. 2001) (appendix)). These statements "must be predicated on evidence introduced during the trial of the case." *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to measure the prejudicial impact of any prosecutorial misconduct, this court should consider: (1) the conduct in light of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

We agree with the trial court that the prosecutor's opening statements were improper. Our supreme court has repeatedly concluded that the use of epithets to characterize a defendant is improper. *State v. Thomas*, 158 S.W.3d 361, 413-14 (Tenn. 2005) (appendix) (concluding that repeatedly referring to the defendants as "greed and evil" during opening and closing statements was improper); *State v. Cauthren*, 967 S.W.2d 726, 737 (Tenn. 1998) (concluding that referring to the defendant as "the evil one" was improper). The remarks of the prosecutor do not appear to have been made in response to an issue raised by trial counsel in voir dire, as trial counsel was not insinuating that something other than the defendant was the root of all evil by asking jurors to evaluate the truthfulness of several well-known expressions. There were no curative measures undertaken by the trial court because the defendant did not object. These remarks appear to have been made for the sole purpose of casting the defendant in a negative light. However, we conclude that the error in the prosecutor's opening statements did not affect the verdict to the defendant's detriment. The remarks were

28

limited to the prosecution's opening statement. Further, while not overwhelming, the evidence against the defendant certainly was substantial. The victim testified that the defendant raped her, and both Ms. Thomas and Mr. Harris heard shouting coming from the victim's room around the time of the rape. DNA recovered from Ms. Keough's sexual assault examination revealed a DNA profile that was a mix between the victim's and the defendant's DNA. The victim testified that she was not able to leave her room for hours after the rape, and Ms. Thomas also testified that the victim was unable to leave her room until Mr. Bibbs came to the residence and asked to meet the victim. Finally, we note that the jury acquitted the defendant of the charged offenses of aggravated rape and aggravated kidnapping. The jury convicted him of the lesser included offenses of rape and false imprisonment, indicating "that the jury carefully considered the evidence and convicted the [defendant] based upon the State's case, not upon the prosecutor's statments" during opening arguments. *State v. Letonio Swader*, No. M2005-00185-CCA-R3-CD, 2006 WL 287384, at *7 (Tenn. Crim. App. Feb. 6, 2006). The defendant is not entitled to any relief.

## IX. Defendant's Prior Incarceration

The defendant argues that it was error for the victim to testify that the defendant was incarcerated. He contends that the testimony constituted evidence of a prior bad act that requires the reversal of his convictions. The defendant acknowledges that he did not make a contemporaneous objection to this testimony at trial and asks this court to review the issue for plain error.

On cross-examination, trial counsel asked the victim if she and the defendant lived with Ms. Grayer while they were dating. The victim replied that she lived there but that the defendant did not. Trial counsel continued to question her about the living arrangement, asking if the victim lived there while she was dating the defendant. The victim answered, "[The defendant] was incarcerated when I was staying there. When he got out, he came over there." The defendant did not object or request a mistrial, and the trial court did not issue a curative instruction.

We conclude that this issue does not warrant plain error review. First, it is not clear that the issue was not waived for tactical reasons. The victim's testimony was elicited on cross-examination, and it is possible that trial counsel made a strategic decision not to object to an answer to his own question to avoid emphasizing the defendant's prior incarceration for the jury. Second, the remark was fleeting, and the victim did not specify the reason that the defendant was incarcerated. The comment did not affect the outcome of the trial to the defendant's detriment, and consideration of the issue is not necessary to do substantial justice. The defendant is not entitled to any relief.

29

## X. Cumulative Error

Both the United States and Tennessee Constitutions protect a defendant's right to a fair trial, but they do not operate to guarantee a defendant "a perfect trial." *State v. Hester,* 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine recognizes "that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated," so affected the proceedings that a reversal is necessary "to preserve a defendant's right to a fair trial." *Id.* There must have been more than one error in the trial to warrant an analysis for cumulative error. *Id.*

In this case, there was not more than one error committed. As a result, the cumulative error doctrine does not apply, and the defendant is not entitled to any relief.

## CONCLUSION

Based upon the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE